**Exhibit A**

# MARY L. SWAIN
## BUTLER COUNTY CLERK OF COURTS

Z000086271

**HELZBERGS DIAMOND SHOPS LLC**
**CSC LAWYERS INCORPORATING COMPANY**
**REGISTERED AGENT**
**221 BOLIVAR STREET**
**JEFFERSON CITY, MO 65101**

Date: March 13, 2025          Case No. : CV 2025 03 0580
VIGILANT LLC vs. HELZBERGS DIAMOND SHOPS LLC

## SUMMONS ON COMPLAINT BY CERTIFIED MAIL
## COURT OF COMMON PLEAS, BUTLER COUNTY, OHIO

To the above named party: You are hereby summoned to answer a complaint that has been filed against you in the Butler County Common Pleas Court by the plaintiff(s) named herein. A copy of the complaint is attached.

You are required to serve upon the plaintiff(s) attorney, or upon the plaintiff(s) if there is no attorney of record, a copy of your answer to the complaint within 28 days after receipt of this summons, exclusive of the day of service. The answer must be filed with this court within three days after service on Plaintiff's attorney.

The name and address of the plaintiff(s) attorney is as follows:

     TAYLOR, SANNA RAE
     TAFT STETTINIUS & HOLLISTER L L P, 425 WALNUT ST., STE. 1800
     CINCINNATI, OH 45202

If you fail to appear and defend, judgment by default may be taken against you for the relief demanded in the complaint.

**MARY L. SWAIN**
Butler County Clerk of Courts

*Mary L. Swain*

By: <u>Norma Martin</u>
Deputy Clerk

GOVERNMENT SERVICES CENTER ● 315 HIGH STREET ● SUITE 550 ● HAMILTON, OHIO 45011-6016

FILED
MARY L. SWAIN
BUTLER COUNTY
CLERK OF COURTS
03/10/2025 04:41 PM
CV 2025 03 0580

**COURT OF COMMON PLEAS**
**BUTLER COUNTY, OHIO**

| | |
|---|---|
| **VIGILANT LLC** | CASE NO. |
| 7570 Bales Street, Suite 250 | |
| West Chester, Ohio 45069 | |
| | Judge |
| Plaintiff, | |
| | |
| v. | |
| | |
| **HELZBERG'S DIAMOND SHOPS, LLC** | |
| 1825 Swift Avenue | **COMPLAINT** |
| North Kansas City, Missouri 64116 | |
| | |
| **SERVE ALSO: CSC LAWYERS** | |
| **INCORPORATING COMPANY** | |
| (Registered Agent) | |
| 221 Bolivar Street | |
| Jefferson City, Missouri 65101 | |
| | |
| Defendant. | |

For its Complaint against Defendant Helzberg's Diamond Shops, LLC ("Defendant" or "Helzberg"), Plaintiff Vigilant LLC ("Plaintiff" or "Vigilant"), states as follows:

### PARTIES

1.     Plaintiff Vigilant LLC is an Ohio limited liability company formed and existing under the laws of the State of Ohio. Vigilant provides high-quality managed detection and cyber security response services to customer subscribers both directly and through third-party providers.

2.     Defendant Helzberg's Diamond Shops, LLC is a Missouri limited liability company formed and existing under the laws of the state of Missouri. Helzberg's principal office is located at 1825 Swift Avenue, North Kansas City, Missouri 64116.

1

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this matter because the agreements executed by the parties contain a consent to jurisdiction and provides that any action arising out of the agreement shall be brought exclusively in Butler County, Ohio. Additionally, the Court has jurisdiction because the services provided under the contract at issue was performed in Butler County Ohio. Plaintiff's damages and the harms and losses caused by Defendant for which Plaintiff seeks to recover exceed $25,000 and therefore are within the jurisdictional limits of this Court.

4.     Venue is proper in Butler County, Ohio because the agreements executed by the parties provide that any action arising out of the agreement shall be brought in Butler County, Ohio. Additionally, Butler County, Ohio is the place where the claim for relief arose.

## FACTUAL ALLEGATIONS

5.     On or about February 10, 2023, Helzberg and Vigilant executed the Vigilant Master Services Agreement ("MSA"). A true and correct copy of the MSA is attached as **Exhibit A**.

6.     On or about February 15, 2023, Helzberg and Vigilant executed a Services Subscription Agreement. A true and correct copy of the Services Subscription Agreement ("Subscription Agreement") is attached as **Exhibit B**.

7.     The Subscription Agreement expressly states that all terms and conditions applicable to the agreements between the parties are available online at https://vigilantnow.com/terms-conditions ("Terms & Conditions"). A true and correct copy of the Terms & Conditions is attached as **Exhibit C**. (The Master Services Agreement, the Subscription Agreement, and the Terms & Conditions are collectively referred to as "the Agreements.")

8.     As part of the Subscription Agreement, "[Helzberg] agree[d] to pay all monthly fees that are invoiced properly and consistently with the below." Subscription Agreement p. 1.

2

9.      Helzberg agreed that the "Contract Start Date will be established as the date that the Vigilant Subscription Letter was signed by Client and will continue for the Term identified below." *Id*. The Subscription Letter was signed on February 15, 2023. *Id*. p.4.

10.      Both the Master Services Agreement and the Subscription Agreement confirm that term of the Agreements shall be three years. Master Services Agreement p. 8 at para. 5.1 ("initial term shall be deemed to be three (3) years from the Effective Date") and Subscription Agreement p.5 ("This Agreement shall commence on the Effective Date and remain in effect for three (3) years from the Effective Date.")

11.      Vigilant agreed to provide certain monitoring and incident response services as described in the Agreements for the network systems and operating environments to which Helzberg gave Vigilant access.

12.      In exchange, pursuant to the Subscription Agreement, Helzberg agreed to pay for initial setup and configuration costs in the amount of **$27,802.00** and full value of the monthly recurring costs of **$14,598.50** equal to the entire three year term. *See* Master Services Agreement; Subscription Agreement pp.1-4.

13.      Helzberg further agreed that Helzberg "shall pay the fees set forth in the Agreement, which shall be determined and invoiced by Vigilant in accordance with the rates, pricing and discounts set forth in the Agreements." Master Services Agreement p. 9, para. 7.

14.      Helzberg also agreed that the obligation to pay the Fees determined and invoiced by Vigilant would survive any expiration or termination of the Agreement. *Id*. p. 9, para. 6.

15.      Based on the Agreements between the parties, Helzberg promised to pay Vigilant a total of **$553,348.00** for the products and services agreed to by Vigilant ("Subscription Amounts"). Subscription Agreement pp. 3-4.

3

16.    Pursuant to the Agreements between the parties, Helzberg did not have a right to terminate the Agreements except where "Vigilant materially breaches the terms of the Agreement and fails to cure such breach within thirty (30) days of written notice." Master Services Agreement p. 8, para. 5.2. Thus, in the event that Helzberg believed that Vigilant breached the Master Services Agreement, if any dispute arose, Helzberg was required to provide Vigilant an opportunity to cure any claimed breach.

17.    Helzberg did not provide written notice to Vigilant of any actual material breach of the Agreements as required under the Agreements and no such breach occurred, and in any event Helzberg did not provide any reasonable opportunity to Vigilant to cure any purported breach, material or otherwise, as Helzberg was required to do under the agreement. *See* Master Services Agreement pp.16-17, para. 14.3. Nor did Helzberg attempt to negotiate or resolve the disputes in good faith as it was required to do.

18.    At all times, Vigilant responded timely to all inquiries and requests made by Helzberg to Vigilant. Prior to this lawsuit Vigilant offered on multiple occasions to meet with and discuss any concerns regarding the services provided by Vigilant. Indeed, Vigilant requested that if Helzberg believed that a breach had occurred, that Vigilant be given a reasonable opportunity to cure, which Helzberg did not do.

19.    Notwithstanding the express terms of the Agreements and without authorization or consent from Vigilant, Helzberg unilaterally demanded and instructed Vigilant to exit Helzberg's networks and operating environment and cease providing all services under the Agreements effective on February 15, 2024. Although Helzberg instructed Vigilant to exit its networks and operating environments and cease providing services, Helzberg had no right or authority to

terminate the obligations under the Agreement and Helzberg remains obligated to pay the full amount due and owing under the terms of the Agreements as invoiced by Vigilant.

20.     Helzberg did not have a good faith basis to demand that Vigilant cease providing services or to attempt to terminate the Agreements, and Helzberg failed to identify any good faith dispute with Vigilant concerning the obligations under the Agreements, including the amounts owed by reason thereof.

21.     Vigilant issued an invoice dated January 30, 2024, in the amount of **$504,514.49**, reflecting the amounts owed under the Master Services Agreements, the Subscription Services Agreement, and the Terms & Conditions as adjusted. A true and correct copy of the Invoice is attached as **Exhibit D**. According to the invoice, payment in full was due on February 14, 2024. Given that the amounts due and owing under the Agreements was agreed to by the parties (*see e.g.*, Subscription Agreement p. 3), there is no reasonable basis to contest the amount owed by Helzberg to Vigilant.

22.     Vigilant has demanded that Helzberg pay all amounts due and owing under the Agreements and as Invoiced.

23.     Helzberg has wrongly failed and/or refused to pay the full amount of Fees that are owed as described in the Invoice and pursuant to the terms of the Agreements and Helzberg's obligation to pay in full is long past due.

24.     Vigilant did not breach any agreement or commit any act or omission that would constitute a breach of the Agreements, material or otherwise, rather Vigilant acted in good faith at all times and fully performed all of its obligations under the Agreements.

25.     Helzberg has materially breached the Agreements by failing and refusing to make the required payments for the full duration of the three-year term under the Agreements.

5

26.     Vigilant attempted in good faith to resolve any disputes between the parties.

27.     All conditions precedent to the filing of this action have been satisfied by Vigilant.

28.     In addition to the Subscription Amounts owed by Helzberg to Vigilant, Helzberg agreed to pay Vigilant's fees including its professional and attorneys' fees incurred as a result of Vigilant having to assert a claim against Helzberg to recover the losses caused by Helzberg's breach or non-fulfillment of any representation, warranty, or covenant under the Agreement, any negligent act or omission on the part of Helzberg in connection with the performance of its obligations under this Agreement. *See e.g.*, Master Services Agreement p.12 at para. 10. Helzberg has failed to pay all amounts owed under the Agreements for the three-year contract term, and accordingly, Vigilant has had to file this lawsuit to obtain the amounts due and owing by Helzberg and to enforce its rights and Vigilant seeks all fees, including professional fees, attorneys' fees, and other costs expended in seeking to collect the amounts owed by Helzberg and enforcing its rights under the terms of the Agreements.

## COUNT I - BREACH OF CONTRACT/BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

29.     Plaintiff incorporates the preceding paragraphs by reference as if fully rewritten herein.

30.     Helzberg and Vigilant entered into the Master Services Agreement, the Subscription Services Agreement, and the Terms & Conditions whereby Helzberg agreed, among other things to pay for initial setup and configuration costs in the amount of **$27,802.00** and monthly recurring costs of **$14,598.50** for a minimum period of three years, including through and until at least February 9, 2026. Master Services Agreement p. 8, para. 5.1; Subscription Agreement pp. 1-4.

6

31. The Agreements required that if Vigilant were found to have materially breached the Agreements, Helzberg was required provide written notice and a thirty (30) day opportunity to cure.

32. The Master Services Agreement, the Subscription Services Agreements, and the Terms & Conditions are valid and enforceable contracts.

33. Vigilant has performed all of Vigilant's obligations required under the Master Services Agreement, the Subscription Services Agreements, and the Terms & Conditions.

34. Vigilant has demanded that Helzberg pay all amounts due and owing under the terms of the Master Services Agreement, the Subscription Services Agreements, and the Terms & Conditions and as Invoiced by Vigilant.

35. Helzberg has materially breached the Master Services Agreement, the Subscription Services Agreements, and the Terms & Conditions by wrongfully failing and/or refusing to timely pay the required amounts owed and as Invoiced by Vigilant.

36. Helzberg has materially breached the Agreements by failing and/or refusing to provide written notice of any actual material breach on the part of Vigilant, indeed, there was no breach material or non-material on the part of Vigilant, and Helzber failed to provide Vigilant with thirty (30) days notice and a reasonable opportunity to cure any such alleged breach or dispute.

37. Helzberg has breached the duty of good faith and fair dealing by refusing to cooperate with Vigilant and to provide Vigilant with a reasonable opportunity to respond to and/or resolve any concerns, issues, or disputes identified by Helzberg before Helzberg directed Vigilant to cease providing services under the Agreements.

7

38.     Helzberg's failure and/or refusal to pay the amounts owed as determined and invoiced by Vigilant are material breaches of the Master Services Agreement, the Subscription Services Agreements, and the Terms & Conditions.

39.     Helzberg's breaches of the Agreements, including its failure to provide required notices, failure and/or refusal to negotiate in good faith, failure to provide Vigilant with the required opportunity to cure in the event that a material breach were deemed to have occurred, and failure and/or refusal to pay the amounts owed and invoiced have directly and proximately caused Vigilant to suffer damages, harms, and losses in an amount to be determined at trial and in excess of $25,000.

40.     Vigilant is entitled and further demands that Helzberg pay all amounts due and owing under the Invoice and for all fees, professional fees, attorneys' fees, and other costs expended in seeking to collect the amounts owed by Helzberg and enforcing Vigilant's rights under the terms of the Agreements.

## COUNT II - TORTIOUS INTERFERENCE WITH BUSINESS AND ECONOMIC RELATIONSHIPS

41.     Plaintiff incorporates the preceding paragraphs by reference as if fully rewritten herein.

42.     Helzberg knew about the existence of one or more of Vigilant's business relationships during this timeframe and economic expectations with its business relationships, referrals, and business interests.

43.     Helzberg knew that Vigilant had reasonable expectations that such business relationships would continue and result in contracts for services to be provided by Vigilant in exchange for payment by those with whom Vigilant had a business relationship.

8

44.    Helzberg, through its Security Operations Lead, Michael Ford and others, during industry meetings and conferences including, at a conference in March 2024, tortiously interfered with one or more of Vigilant's known business relationships when Helzberg and Ford made improper statements for improper purposes to other professionals and individuals in the industry, including having made false, misleading, and disparaging statements about Vigilant and its provision of services, the quality and competence of the services provided by Vigilant, including but not limited to:

a.    Vigilant failed to provide the services agreed to between Vigilant and Helzberg;

b.    Vigilant failed to detect certain threat actors within Helzberg's systems; and

c.    That Helzberg does not know why the business would use Vigilant as a data security provider and stating or implying that businesses should not use Vigilant as a data security provider and implied that Vigilant would provide inadequate services and miss detections if contracted to do so.

45.    Helzberg's statements were false, misleading and made by Helzberg for improper purposes, for reasons including that:

a.    Helzberg did not accurately describe the terms or obligations under the Agreements between Vigilant and Helzberg;

b.    Vigilant did not fail to provide any services agreed to between Vigilant and Helzberg;

c.    Vigilant did not fail to detect threat actors in network systems or operating environments where Vigilant had been granted access by Helzberg to monitor and detect threat actors; and

9

d.  Vigilant did not have an agreement or obligation to detect any threat actors in network systems or operating environments to which Helzberg did not provide access to Vigilant or that were not outlined in the Agreements.

46.  Helzberg's statements were made improperly and intentionally for the purpose of interfering with Vigilant's business relationships, to terminate the Vigilant's business relationships, and/or to prevent Vigilant from entering into a contract with one or more of Vigilant's business relationships known to Helzberg and Helzberg's false, misleading, and improper statements were made to individuals, and company representatives, referral sources, and/or customers who worked with, were intending to do business with, considered doing business with, and/or otherwise referred business to Vigilant.

47.  Helzberg, through the statements made by Ford and others, did not have any justification or privilege to make false or misleading statements or disparaging statements about Vigilant and the service and capabilities Vigilant provides, created negative implications about Vigilant and/or the quality or competence of the data security services Vigilant provides.

48.  Helzberg's statements and acts of intentional interference directly and proximately caused one or more of Vigilant's business relationships to terminate its relationship with Vigilant and interfered with and/or prevented Vigilant from entering into a contract for payment of Vigilant's services with one or more of Vigilant's business relationships and/or referral sources.

49.  Helzberg's false statements and other tortious acts of interference made through Ford directly and proximately caused Vigilant to suffer damages, harms, and losses in excess of $25,000 in an amount to be proven at trial.

50.  In addition Vigilant is further entitled to recover punitive and exemplary damages caused by Helzberg's wrongful conduct as described herein.

10

51.     Vigilant is entitled and further demands that Helzberg pay all damage and for all fees, professional fees, attorneys' fees, and other costs expended in seeking to collect the amounts owed by Helzberg and enforcing Vigilant's rights under the terms of the Agreements.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Vigilant LLC demands judgment against Defendant Helzberg as follows:

1.     Actual damages in excess of $25,000, the amount which will be proven at trial;

2.     All pre-judgment and post-judgment interest on all damages at the highest rate allowable by law;

3.     Punitive and exemplary damages caused by Helzberg's wrongful conduct;

4.     For all fees, professional fees, attorneys' fees and costs incurred in this lawsuit and as permitted under the Agreements;

5.     For any and all other legal or equitable relief to which Vigilant may be justly entitled.

Respectfully submitted,

/s/ Sanna-Rae Taylor
Sanna-Rae Taylor (0091302)
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
Phone: (513) 381-2838
Fax: (513) 381-0205
srtaylor@taftlaw.com

*Trial Counsel for Plaintiff Vigilant LLC*

11

## **INSTRUCTIONS TO THE CLERK**

Please serve a copy of the Complaint and Summons via certified mail, return receipt requested, upon each address listed for the Defendant listed in the caption, according to the Ohio Rules of Civil Procedure and applicable law.

/s/ Sanna-Rae Taylor
Sanna-Rae Taylor

12

# Exhibit A

# Vigilant Master Services Agreement

2/10/2023

This Vigilant Master Services Agreement (**"Agreement"**) is made effective as of _____ (the **"Effective Date"**) by and between Helzberg's Diamond Shops, LLC d/b/a Helzberg Diamonds, a Missouri limited liability company, (the "Customer") and Vigilant LLC, an Ohio limited liability company (**"Vigilant"**).

**Whereas**, the Vigilant has developed certain software applications and platforms which it makes available to subscribers/customers;

**Whereas**, the Customer wishes to use the services as more fully described herein;

**NOW, THEREFORE**, for and in consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound hereby, covenant and agree as follows:

## Terms & Conditions

**These Terms and Conditions** ("Terms") apply to and govern all products, Software and Services provided by Vigilant LLC and its Affiliates ("Vigilant") and any Person who uses any Vigilant products, Software and Services ("Customer").

**SERVICES**

1. **SUBSCRIPTION AGREEMENTS**
    1. Vigilant shall, in accordance with all terms and conditions set forth in the Agreement, provide Customer the services described in the Agreement ("Services").
    2. The Agreement will be effective only when signed by Customer and Vigilant. Any modifications or changes to any Agreement or the Services will be effective only by a written change order signed by both Parties.
2. **LIMITATIONS ON VIGILANT'S OBLIGATIONS.**
    1. Customer specifically acknowledges that certain aspects of the Services are provided or controlled by third parties. At times, actions or inactions by third parties can impair or disrupt the Services. Although Vigilant will use commercially reasonable efforts to remedy and avoid any impaired or disrupted Services, Vigilant cannot and does not guarantee that the Services will not be impaired or disrupted. Customer acknowledges that its performance of all of its obligations under the Agreement is necessary for Vigilant's successful performance of the Services. Any failure by Customer to perform its obligations,

1

1928697v7

that in Vigilant's reasonable judgment prevents or materially hinders Vigilant's performance of the Services, constitutes a material breach of the Agreement.

2. Vigilant is not obligated to: (i) retain or back up any Customer Information, except as deemed necessary by Vigilant for the performance of the Services; (ii) maintain a chain of custody of any Customer Information for any purpose; (iii) initiate a response to a discovered Compromise or Incident except as expressly stated in an Agreement; (iv) implement any remediation tasks or improvements as a result of or to avoid Compromises or Incidents; (v) monitor any elements of Customer's environment except as expressly stated in an Agreement, including traffic on unmonitored portions of Customer's network and non-electronic events such as sharing access credentials; or (vi) identify or correct any errors or inaccuracies in any Customer Information.

3. Both Parties acknowledge that all publicly available and privately built networks are inherently insecure and Vigilant makes no guarantee against unauthorized access or breach. Vigilant will use commercially reasonable efforts to implement and deploy reasonable security features, procedures and technologies that will, in Vigilant's reasonable opinion, provide reasonable protection to any Customer Information hosted by Vigilant from unauthorized access. Vigilant is not liable for any loss or damage arising from unauthorized access to Customer Information or any insecure features or design of any publicly or privately available network.

3. **CUSTOMER ENVIRONMENT**

Customer acknowledges that the configuration of Customer's environment may require Vigilant to alter the standard deployment of its Services and may affect the effectiveness or accuracy of the Services. Customer shall promptly notify Vigilant of any changes to its software, hardware, or configuration of the Customer environment that may impact Vigilant's performance of the Services. At times, Vigilant may make recommendations to Customer as part of Services that may require changes to Customer's environment. Customer is solely responsible for any changes made or not made to its environment during the term of any Agreement. Vigilant may monitor, intercept and review activities of Customer employees, contractors and other individuals with access to Customer IT resources and communications systems, including but not limited to email (both outgoing and incoming), instant messages and internet postings and activities. This might include, without limitation, the monitoring, intercepting, accessing, recording, disclosing, inspecting, reviewing, retrieving and printing of transactions, messages, communications, postings, log-ins, recordings and other uses of the systems as well as keystroke capturing and other network monitoring technologies. Vigilant may also store copies of such data and communications for a period of time. Customer consents to such activities by Vigilant.

4. **USER DATA AND FORENSIC DATA RETENTION AND PRIVACY**

1. Your signature below expressly grants Vigilant the right to monitor all network and host related traffic on Customer networks and to retain a copy of all information captured by Vigilant from Customer systems and networks ("Captured Data"). Any Captured Data, which in Vigilant's sole discretion, is identified as malware, forensic threat-specific data, or is in any way related to a Compromise or Incident shall be separately designated as "Threat Data" Customer grants Vigilant, a worldwide, perpetual, irrevocable, non-exclusive, royalty-free license to duplicate, sell, transmit, publish, modify, distribute, publicly display, summarize, alter, compile and create derivative works of any Threat Data. Before sharing Threat Data with a third party, Vigilant will undertake commercially reasonable and good faith efforts to determine if any Customer Confidential Information is contained in or attached to the Threat Data and, if so, will undertake the following steps before proceeding:
   1. remove Customer Confidential Information from the Threat Data unless required to remain for analysis by Vigilant or as required by law; and
   2. except as required by law, before Threat Data that includes Customer Confidential Information is submitted to any third party, Vigilant will provide Customer the full submission sample for Customer's prior written approval as to any such submission to a third party.
2. Vigilant may collect the Private Information of Customer and Customer employees, contractors and agents during its performance of Services or its retention of Forensic Data. To the extent Vigilant collects Private Information or Customer provides Private Information to Vigilant, it shall be Customer's responsibility to identify such information and ensure both Parties' compliance with regard to all applicable privacy Laws, regulations and restrictions, including all data privacy Laws and all related license requirements in this regard; provided that Customer shall not be responsible for Vigilant's compliance or non-compliance with the laws (including privacy laws) that are applicable to Vigilant as a service provider. Customer represents and warrants that (i) it has obtained all necessary permissions and documents, including consent forms, licenses, agreements and certifications, necessary for Vigilant to perform the Services in a manner consistent with Law; and (ii) Customer complies with all applicable laws for processing and transferring Customer Information to Vigilant. Vigilant may disclose Customer Information, including Private Information and Confidential Information, where Vigilant is required by law to make such disclosure.

5. **ALERTING AND REPORTING**
   1. Vigilant shall monitor and evaluate alerts generated by the Services consistent with the Agreement (24/7/365 or 8:00-5:00 Monday-Friday depending on Service Agreement). If Vigilant determines that the alert is a threat to the security of Customer's environment, Vigilant shall provide an analysis of each alert or category of alert to Customer pursuant to the Agreement, or according to the Service Level Agreement Response Times outlined in 5.2. If Vigilant

3

determines that an alert is a "false positive" or that it otherwise poses no legitimate threat to Customer's environment, Vigilant shall have no obligation to provide an alert analysis.

2. Service Level Agreement Response Times:

    1. Critical – (Covers Identified or imminent /critical threat(s) to an organization's Mission Critical systems and any critical P1 down operational outages that require immediate resolution 24x7). Critical Issues on inbound/outbound issues carry an immediate to 2 hours response time. On Critical issues Vigilant will host an open ended conference bridge to collaborate and provide continuous interaction until resolution.

    2. High – (Covers Potential threat(s) to an organization and any Potential operational outage or service outage to user(s) or Mission Critical Systems). The response time for this High level events is 4 hours 24x7.

    3. Medium – Any general change request of a non-critical nature however is considered medium level. The response time for this level is 8 hours and is available M-F.

    4. Low – Low priority change requests and or information changes and needs are considered to be low level response. Our response time is 24 hours in this category, Monday through Friday only.

3. Communicating initial threat information will be via phone, email, or a unique Customer portal. Alert details will only contain information available to Vigilant. For example, actual source IP address for an alert may be obscured from Vigilant by infrastructure within the customer environment such as proxy servers. Determination of actual source of an alert may require additional investigation by the Customer and Vigilant. Analysis performed beyond alert notification is considered "Incident Response." Unless expressly stated in the Agreement, Vigilant is not responsible to provide Incident Response.

6. **Penetration Testing**

    1. Authorization

        1. Customer agrees that it has authorized Vigilant to perform penetration testing against their owned applications and warrants Customer has authority to request such services. This testing will include various types of network and application based attacks and can included scanning of all Customer systems, to attack Customer infrastructure for the purposes of identifying information security vulnerabilities in service of the Customer, to perform conduct within and outside of the Customer infrastructure that would otherwise be illegal activity if not already expressly permitted by Customer and to provide any other services to Customer as identified in any statement of work or as described in the invoice above (collectively, the "Services"). The work will be performed remotely and no physical access to the client environment will be needed. The

4

deliverable of the penetration test report will be delivered no more than 2 weeks after the test completion date

2. Additional Penetration Testing Indemnification
   1. Customer acknowledges and accepts that Vigilant, in its performance of the Services, may possibly harm or otherwise interfere with Customer infrastructure, systems, data, or property. Customer, on behalf of itself and its successors, assigns and other legal representatives, hereby absolutely, unconditionally and irrevocably covenant and agree that it will hold Vigilant harmless and will not sue Vigilant (at law, in equity or otherwise) for any harm or loss incurred by Customer that arises or in any way relates to Vigilant's provision of the Services, except for any such actions by Vigilant that are held to be negligent or reckless by a court of appropriate jurisdiction. Customer agrees to indemnify and hold Vigilant harmless for any liability, loss, cost, damage or expense, including reasonable attorney's fees, resulting from third-party claims against Vigilant when inaccurate information or direction provided by Customer causes Vigilant to take any action in performing the Services that violate applicable law, contract or any third-party's rights. Customer acknowledges that Vigilant is engaged in the business of providing computer security services and associated deliverables to various clients and that none of these arrangements is exclusive.

3. Data Exfiltration
   1. Any sensitive data located will be documented and testing will be performed to see if the data can be transferred undetected to the test machine's encrypted hard drive.
   2. Sensitive data will be handled under the proper requirements governed by the Customer's compliance requirements.
   3. Any Sensitive data will be destroyed post assessment and a document of destruction will be given to the Customer on the completion of the assessment.

4. Clean Up Installed Software and Tools
   1. The tester will remove any software or other artifacts used during testing so that the systems are all returned to their pre-test state.

5. Customer Requirements
   1. Customer will guarantee that all sites and systems designated for scanning are available. If delay is caused by the site(s) or systems not being ready additional charges will apply at a rate of $500.00 per resource. If this takes place Vigilant project manager and Customer contact will work to agree upon a reasonable and mutually acceptable time to reschedule work.
   2. It may be required for the Customer to provide Hardware or Software to Vigilant in order for Vigilant to perform an accurate and complete test. If

5

1928697v7

Hardware or Software from the Customer are required the request will be made by Vigilant to the Customer in writing. All hardware and software provided by Customer will be assumed to be good and in working order. Customer is responsible for all software licensing requirements, software compatibility with hardware or hardware requirements by software and its functionality if applicable. All software and hardware will be returned to the client after the assessment. If the assessment includes destruction of the hardware or software Customer acknowledges that the hardware and software may not be returned in working order and or the state it was delivered to Vigilant in.

6. Assessment Hours

   1. Unless otherwise defined all assessment work will be performed during normal business hours 8-5 M-F unless designated in writing by Customer. Customer will designate a single point of contact to whom all Vigilant communications may be addressed and who has the authority to act on all aspects of the services throughout the duration of the project; such contact shall be available during normal hours of business (Monday through Friday, 8:00am to 5:00pm local site time, excluding holidays)

## GRANT OF LICENSE

### 1. **LICENSE GRANT**

Vigilant grants to Customer, exercisable solely by Authorized Users, a non-exclusive and non-transferable right and license to access and use the Software and Services during the Term. Customer shall access and use the Software and Services solely for internal business purposes and as set forth in the Agreement. Customer shall have transfer, assignment or sublicense rights absent express written consent from Vigilant. Customer acknowledges and agrees that Customer is solely responsible for ensuring that Authorized Users comply with the Agreement and Customer shall be solely responsible for any breach of the Agreement due to the action or inaction of any Authorized User or of any employee, agent, customer, or contractor of Customer. Customer shall and shall not permit any third party to: (i) remove of modify any markings or reference to Vigilant or its licensors' proprietary rights from Vigilant Software or Services; (ii) make the Software, Services, or any materials thereof available in any manner to any third party for use in the third party's business operations; (iii) download, reproduce, copy, republish, alter, adapt, modify, improve, translate, create derivative works from, reverse engineer any part of the Services or Software, disassemble, decompile or otherwise attempt to reveal the trade secrets, know-how, or other Intellectual Property Rights underlying or included in the Software or Services; (iv) access or use the Software or Services in order to build or support and/or assist a third party in building or supporting, products or services competitive to Vigilant; (v) interfere in any manner with the hosting

6

1928697v7

of the Software or the Services; (vi) license, sell, rent, lease, transfer, assign, distribute, display, host, outsource, disclose, permit time-sharing, or otherwise commercially exploit or make the Services, Software, or related materials available to any third party; or (vii) otherwise use the Services or Software not in accordance with the Agreement. Upon expiration or termination of the Agreement, for any reason, Customer's right to access or use the Software and Services shall immediately terminate.

2. **LICENSE RESTRICTIONS**

Vigilant will assign to each Authorized User a unique password and identification name ("Authorized User Credentials"). Authorized User Credentials allow the Authorized User to access the administrative components of the Software and Services. Customer must immediately inform Vigilant if it discovers or reasonably believes that Authorized User Credentials or any other security mechanism issued by Vigilant is lost or forgotten, has or is likely to become known to someone not authorized to use it or is being or is likely to be used in an unauthorized way. In such an event, Customer must complete such security checks as Vigilant deems appropriate. Vigilant reserves the right to suspend access to the Software and Services if at any time Vigilant considers that there is or is likely to be a breach of security or if Customer fails to comply with Vigilant's instructions or requests in relation to security matters.

3. **LIMITED LICENSE FORM THIRD PARTIES**

Vigilant may use software/hardware for the Services that are subject to shrink-wrap, click-through, on-screen, open source, or similar licensing arrangements that Customer must timely accept during Vigilant performance of the Services. Vigilant shall obtain Customer's approval prior to accepting the terms of such agreements on behalf of Customer if acceptance of such agreement will require payment from Customer. Where applicable, Vigilant will convey to Customer the requisite license rights to software used by Vigilant to provide the Services. Customer shall either directly pay all costs of all such software/hardware, including all licensing fees, or promptly reimburse Vigilant for all such costs.

4. **OPEN SOURCE SOFTWARE LICENSE**

The Software and Services may utilize one or more open source packages. This open source software is governed by the terms and conditions of the applicable open source license and Customer agrees that it will be bound by the terms and conditions of the applicable open source license in connection with its use and distribution of the open source software in the Software and Services. The open source software, the applicable open source licenses and other open source notices will be made available upon request.

7

5. **TERM AND TERMINATION**
   1. **TERM AND RENEWAL**

      The Agreement shall commence on the Effective Date and remain in effect for the term identified in the Agreement (the "Initial Term"). If no Initial Term is identified in the Agreement, the Initial Term shall be deemed to be three (3) years from the Effective Date. Vigilant reserves the right to increase service and product rates at the time of any agreed upon subsequent renewals. The Initial Term and any renewal term are referred to collectively as, the "Term."

   2. **TERMINATION**

      Vigilant may terminate the Agreement immediately if in Vigilant's sole discretion Customer materially misuses the Software or Services, engages in illegal practices, or otherwise materially breaches the Agreement. Vigilant may also terminate the Agreement at any time, for any cause, upon thirty (30) days prior written notice. Customer may terminate the Agreement if Vigilant materially breaches the terms of the Agreement and fails to cure such breach within thirty (30) days of written notice.

   3. **EFFECT OF TERMINATION OR EXPIRATION**

      Upon and after the termination or expiration of any Agreement for any or no reason:

      1. Customer shall immediately cease use of all Vigilant Materials and Confidential Information.
      2. Subject to continuing rights, licenses and obligations of either Party under the Agreement, all licenses granted hereunder will immediately terminate and the Parties shall cease all activities concerning, including all use of, in the case of Customer, the expired or terminated Services and/or Software and related Vigilant Materials and, in the case of Vigilant, the Customer Information.
      3. Vigilant shall immediately cease use of Customer's Confidential Information except to the extent that such Confidential Information is, in Vigilant's reasonable opinion, inseparable from the Forensic Data Vigilant is entitled to retain and use under the Agreement. In such circumstances, Vigilant shall have no obligation to cease use of or destroy the inseparable Confidential Information. Such inseparable Confidential Information will remain subject to the safeguards set out in this Agreement and generally accepted industry standards and procedures

8

used to protect such Confidential Information against any unauthorized access and use.

4. Except in the case of amounts subject to a good faith dispute, Customer shall pay to Vigilant, (i) all charges and amounts due and payable to Vigilant, if any, for Services performed under the terminated or expired Agreement; (ii) all reimbursements for costs/expenses incurred by Vigilant during the term of the Agreement; (iii) any deferred payments; (iv) 100% of any rate reduction or discount previously granted if the Agreement or any Agreement is terminated before the end of the Term. Customer shall not be entitled to any refund of any undisputed payments made by Customer.

5. Each Party shall, at the other Party's option and upon its written request and subject to any retention rights in the Agreement: (i) promptly return or destroy and erase from all systems it directly or indirectly uses or controls all originals and copies of all of the other Party's Confidential Information; and (ii) provide a written statement to the other Party certifying that it has complied with the requirements of this section.

6. **SURVIVAL**

The following provisions set forth and any other right or obligation of the Parties in the Agreement that, by its nature, should survive termination or expiration of the Agreement, will survive any expiration or termination of the Agreement: Term and Termination Section, Survival Section , Fees, Taxes and Expenses Section, Ownership Section, Confidentiality Section, Indemnification Section, Limitation of Liability Section, Representation and Warranties Section, Force Majeure Section  and Governing Law Sub-Section under Miscellaneous Section

7. **FEES, TAXES and EXPENSES**
    1. Subject to the terms of the Agreement, Customer shall pay the fees set forth in the Agreement, which shall be determined and invoiced by Vigilant in accordance with the rates, pricing and discounts set forth in the Agreement ("Fees").
    2. All Fees and amounts set forth in the Agreement are exclusive of taxes. Customer shall be solely responsible for all sales, service, value-added, use, excise, consumption and any other taxes, duties and charges of any kind, if any, imposed by any governmental entity on any amounts payable by Customer under the Agreement, other than any taxes imposed on, or with respect to, Vigilant income, revenues, gross receipts, personnel, real or personal property or other assets.
    3. Customer shall reimburse Vigilant for direct, documented, out-of-pocket expenses incurred by Vigilant in performing the Services, provided that Customer

9

shall only be obligated to reimburse Vigilant for travel and lodging expenses approved in advance by Customer.

## 8. OWNERSHIP

### 1. CUSTOMER INFORMATION

Customer will provide Customer Information to Vigilant in connection with the Agreement and Services. Customer will remain the sole and exclusive owner of all right, title and interest in and to all Customer Information, including all Intellectual Property Rights relating thereto, subject only to the licenses granted in the Agreement. Subject to the terms and conditions of the Agreement, Customer hereby grants Vigilant a limited, royalty-free, non-exclusive, transferable and sublicensable license to Process the Customer Information solely as reasonably necessary to provide the Services and as reasonably necessary to exercise any of the rights granted to Vigilant under the Agreement.

### 2. VIGILANT MATERIALS

Vigilant is and will remain the sole and exclusive owner of all right, title and interest in and to the Vigilant Materials, including all Intellectual Property Rights relating thereto, subject only to any license expressly granted to Customer in the Agreement. Excepting any limited license expressly provided in the Agreement, nothing contained in the Agreement shall be construed as granting Customer, or any third party, any right, title, or interest in or to any Vigilant Materials, in each case whether by implication, estoppel or otherwise.

## 9. CONFIDENTIALITY

### 1. CONFIDENTIAL INFORMATION

In connection with the Agreement and Services, each Party (as the "Disclosing Party") may disclose or make available Confidential Information to the other Party (as the "Receiving Party"). Subject to the exclusions listed below, "Confidential Information" means information in any form or medium (whether oral, written, electronic or other) that the Disclosing Party reasonably considers confidential or proprietary, including Private Information, information consisting of or relating to the Disclosing Party technology, trade secrets, know-how, business operations, plans, strategies, customers and pricing and information with respect to which the Disclosing Party has contractual or other confidentiality obligations that is either marked, designated or otherwise identified as "confidential" or that should reasonably be understood to be confidential considering the circumstances of its disclosure. Without limiting the foregoing, (i) all Customer Information is and will remain the Confidential Information of Customer, including but not limited to the presence, nature and

10

extent of any security vulnerabilities and other information that Vigilant discovers regarding Customer's information systems and networks during the course of this engagement which shall remain Customer's Confidential Information, excluding any Threat Data collected, and (ii) all Vigilant Materials including the Software, Specifications and Documentation are and will remain the Confidential Information of Vigilant and (iii) the terms of the Agreement are the Confidential Information of Vigilant.

2. **EXCLUSIONS**

Confidential Information does not include information that: (i) was rightfully known to the Receiving Party without restriction on use or disclosure prior to such information being disclosed or made available to the Receiving Party in connection with the Agreement; (ii) was or becomes generally known by the public other than by the Receiving Party's or any of its employees, agents, contractors, or other representatives' noncompliance with the Agreement; (iii) was or is received by the Receiving Party on a non-confidential basis from a third party that was not or is not, at the time of such receipt, under any obligation to maintain its confidentiality; or (iv) was or is independently developed by the Receiving Party without reference to or use of any Confidential Information.

3. **SAFEGUARD**

As a condition to being provided with any disclosure of or access to Confidential Information, the Receiving Party (i) shall not access or use, or permit the access or use of Confidential Information other than as necessary to exercise its rights or perform its obligations under and in accordance with or as expressly authorized by the Agreement and (ii) shall safeguard the Confidential Information from unauthorized use, access or disclosure using at least the degree of care it uses to protect its own similarly sensitive information and in no event less than a reasonable degree of care.

4. **COMPELLED DISCLOSURES**

If the Receiving Party or any of its representatives is compelled by applicable Law to disclose any Confidential Information then, to the extent permitted by applicable Law, the Receiving Party shall: (i) promptly and prior to such disclosure, notify the Disclosing Party in writing of such requirement so that the Disclosing Party can seek a protective order or other remedy, or waive its rights; and (ii) provide reasonable assistance to the Disclosing Party, at the Disclosing Party's sole cost and expense, in opposing such disclosure or seeking a protective order or other limitations on disclosure. If the Disclosing Party waives

11

compliance or, after providing the notice and assistance required under this paragraph, the Receiving Party remains required by law to disclose any Confidential Information, the Receiving Party shall disclose only that portion of the Confidential Information that the Receiving Party is legally required to disclose and, upon the Disclosing Party's request, shall use commercially reasonable efforts to obtain assurances from the applicable court or other presiding authority that such Confidential Information will be afforded confidential treatment. No such compelled disclosure by the Receiving Party will otherwise affect the Receiving Party's obligations hereunder with respect to the Confidential Information so disclosed.

## 10. **INDEMNIFICATION**

1. Each Party shall indemnify, hold harmless and defend the other Party and its managers, officers, directors, employees, agents, Affiliates, contractors, successors and assigns, from and against any losses, damages, liabilities, deficiencies, claims, actions, suits, judgments, settlements, interest, awards, penalties, fines, costs or expenses of whatever kind, including professional fees and reasonable attorneys' fees incurred by such Party that arise out of any direct or third-party claim alleging: (i) breach or non-fulfillment of any representation, warranty, or covenant under this Agreement by indemnifying Party or its managers, officers, directors, employees, agents, Affiliates, contractors, successors and assigns ("Personnel"); (ii) any negligent or more culpable act or omission of indemnifying Party or its Personnel (including any reckless or willful misconduct) in connection with the performance of its obligations under this Agreement; (iii) any use consistent with the Agreement that results in the infringement of any Intellectual Property Rights or other privacy violations; (iv) any bodily injury, death of any person, or damage to real or tangible personal property caused by the negligent or more culpable acts or omissions of indemnifying Party or Personnel (including any reckless or willful misconduct); or (v) any failure by of indemnifying Party to comply with any applicable federal, state, or local laws, regulations, or codes in the performance of its obligations under this Agreement.

2. If Vigilant believes or it is determined that any of the Software may have violated a third party's Intellectual Property Rights, Vigilant shall, as Customer's sole remedy for such violation either:

   1. modify or replace the Software to be non-infringing (while substantially preserving its utility or functionality) and provide such cybersecurity services consistent with industry norms for the continuity of safe business;

   2. obtain for Customer a license to allow for continued use of the Software; or

12

1928697v7

3.  end the relevant license, terminate Customer's access to the Software, refund any prepaid fees not yet earned and terminate the Agreement.

Vigilant is not obligated to take any of the above-described actions to the extent claims or actions are based on or result from: (i) modifications or alterations of the Software by Customer; (ii) use of the Software outside the scope of use identified in the Agreement or in Vigilant's user Documentation or policies; or (iii) the combination of the Software with any products or services not provided by Vigilant.

## 11. **LIMITATION OF LIABILITY**

IN NO EVENT WILL VIGILANT BE LIABLE UNDER THE AGREEMENT FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES EVEN IF ADVISED OF OR MADE AWARE OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL VIGILANT'S LIABILITY UNDER THE AGREEMENT EXCEED ONE MILLION DOLLARS. THE ABOVE LIMITATIONS SHALL NOT APPLY IN THE CASE OF A PARTY'S FRAUD.

## 12. **REPRESENTATIONS AND WARRANTIES; DISCLAIMER.**

1.  Each Party represents and warrants to the other Party that (i) it is duly organized, validly existing and in good standing as a corporation or other entity under the Laws of the jurisdiction of its incorporation or other organization, (ii) it has the full right, power and authority to enter into and perform its obligations and grant the rights, licenses, consents and authorizations it grants or is required to grant under the Agreement. (iii) the execution of the Agreement by its representative whose signature is set forth at the end of the Agreement has been duly authorized by all necessary corporate or organizational action of such Party; and (iv) when executed and delivered by both Parties, the Agreement will constitute the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms. Customer further represents, warrants and covenants that Customer owns or otherwise has and will have the necessary rights and consents in and relating to the Customer Information so that, as received by Vigilant and used in accordance with the Agreement, they do not and will not infringe, misappropriate or otherwise violate any Intellectual Property Rights, any privacy, or other rights of any third party or violate any applicable law. Vigilant further represents, warrants and covenants that to its knowledge Vigilant owns all Vigilant Materials including the Software, Specifications and Documentation and such Vigilant Material does not and will not knowingly infringe, misappropriate or otherwise violate any Intellectual Property Rights, any privacy, or other rights of any third party or violate any applicable law. Vigilant further represents, warrants and covenants that it has

13

performed a thorough background check of all its employees, and subcontractors and no such employee or subcontractor have any history or connections to unauthorized hacking by such personnel. Vigilant shall instruct its personnel to only conduct permitted exploitation attempts and penetration testing in accordance with this Agreement. If Vigilant becomes aware of any failure to abide by such requirements by its personnel it shall promptly notify Customer of such failure and cooperate with Customer related to any mitigation required to address any risks to Customer's systems security or functionality caused solely by Vigilant.

2. **DISCLAIMER OF WARRANTIES**
EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS SECTION, ALL SERVICES AND VIGILANT MATERIALS ARE PROVIDED "AS IS" AND VIGILANT HEREBY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE and VIGILANT SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT and ALL WARRANTIES ARISING FROM COURSE OF DEALING, USAGE OR TRADE PRACTICE. WITHOUT LIMITING THE FOREGOING, VIGILANT MAKES NO WARRANTY OF ANY KIND THAT THE SERVICES OR VIGILANT MATERIALS, OR ANY PRODUCTS OR RESULTS OF THE USE THEREOF, WILL MEET CUSTOMER'S OR ANY OTHER PERSON'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION, ACHIEVE ANY INTENDED RESULT, BE COMPATIBLE OR WORK WITH ANY SOFTWARE, SYSTEM OR OTHER SERVICES, BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE OR ERROR FREE, OR THAT THE SOFTWARE OR SERVICES WILL PROTECT CUSTOMER AGAINST ALL POSSIBLE SECURITY THREATS, INCLUDING INTENTIONAL MISCONDUCT BY THIRD PARTIES OR BY CUSTOMER OR CUSTOMER'S PERSONNEL. ALL THIRD-PARTY MATERIALS ARE PROVIDED "AS IS" AND ANY REPRESENTATION OR WARRANTY OF OR CONCERNING ANY THIRD-PARTY MATERIALS IS STRICTLY BETWEEN CUSTOMER AND THE THIRD-PARTY OWNER OR DISTRIBUTOR OF THE THIRD-PARTY MATERIALS.

3. Customer agrees to comply with the requirements of all applicable laws, rules and regulations in connection with the Agreement and the Services provided. Vigilant reserves the right to take all actions that it believes necessary to comply with any applicable law, rule, or regulation including immediate termination of the Services with prompt notice to Customer.

4. Customer agrees that Vigilant is not responsible for any delays caused by Customer. Customer further recognizes that the Software and Services involve a risk of loss of or disruption to Internet services, network services, electronic communications, information, Customer Information and data, including, but not limited to, third party access to the foregoing in a manner that may have adverse business consequences for Customer. Customer assumes all risk of loss of, or disruption to, the foregoing and hereby releases Vigilant and its Affiliates from

14

any liability for any such loss including, but not limited to (i) the use or inability to use the Software or any system or application; (ii) any infringement or claim of infringement of a copyright, patent or other Intellectual Property Right allegedly implicated by the Software or Services or any other software acquired in connection with the Services; (iii) any loss of or changes to Customer Information or other data, or the inaccuracy of Customer Information or other data; (iv) the content of Customer Information; (v) delays or failures to perform any obligations hereunder due to a Force Majeure event; (vi) impairments to the Services caused by acts within the control of the Customer, its employees, or its agents; (vii) interoperability of specific Customer applications or systems; (viii) Customer's inability to access or interact with other providers or their services through the Internet; (ix) performance impairments caused on the Internet; (x) the cost of substitute goods, services, or technology; and/or (xi) any business loss, including, but not limited to, lost profits.

5. Customer specifically acknowledges that each type of information security threat or attack presents unique challenges, not all of which are related to technology (e.g., some security breaches may be due to human factors such as an employee divulging their password) and that Vigilant cannot be responsible for monitoring or analyzing items that are not specifically outlined in the Agreement.

6. Unlimited Breach Response Policy: Under this Subscription Agreement Vigilant provides unlimited breach response forensics at no additional cost to the Customer for any incidents that originated in their environment while under Vigilant's protection. If an incident response is initiated and it is determined that the incident happened, or was associated to an event that preceded Vigilant Services, the Customer will incur an incident response service charge. The scope of the unlimited breach response forensics only applies to the capabilities of the Services the Customer subscribes to and only for network segments, or endpoints, with Vigilant Services installed on them. For example, if the Customer subscribes to MNDR services and not MEDR then incident response forensics would only cover a Customer network and not endpoints and only on the segments of the Customer network(s) traffic that MNDR is configured to monitor. Unlimited breach response for MEDR only applies for Customers that subscribe to MEDR and choose Crowdstrike as the integration and endpoint tool. In order to be eligible for Vigilant's unlimited breach response coverage, Vigilant's implementation teams must certify client environment during the onboarding process of Vigilant services in client environment. Customer will receive a certification document during this process. If it is found that client modified Vigilant Service deployments post certification, Vigilant will not be obligated to honor unlimited breach response services and The Customer will be obligated to pay Vigilant for all incident response services provided to Customer.

15

If the Customer's forensic investigation requirements are outside of subscribed Services, The Customer may purchase incident response hours from Vigilant to cover said requirements. If the forensic investigation calls for additional data or information, the Customer is responsible for providing access to this data in a secure and timely manner.

## 13. **FORCE MAJEURE**

In no event will Vigilant be liable or responsible to Customer, or be deemed to have defaulted under or breached the Agreement, for any failure or delay in fulfilling or performing any term of the Agreement, when and to the extent such failure or delay is caused by any circumstances beyond Vigilant's reasonable control, including acts of God, flood, fire, earthquake or explosion, war, terrorism, invasion, riot or other civil unrest, embargoes or blockades in effect on or after the date of the Agreement, national or regional emergency, strikes, labor stoppages or slowdowns or other industrial disturbances, passage of Law or any action taken by a governmental or public authority, including imposing an embargo, export or import restriction, quota or other restriction or prohibition or any complete or partial government shutdown, or national or regional shortage of adequate power or telecommunications or transportation. Notwithstanding the foregoing, if the Force Majeure Event or its effects continue to present beyond a period of three (3) months; Customer shall the right to cause termination of this Agreement.

## 14. **MICELLANEOUS**

### 1. **Relationship of the Parties**

The relationship between the Parties is that of independent contractors. Nothing contained in the Agreement shall be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment or fiduciary relationship between the Parties and neither Party shall have authority to contract for or bind the other Party in any manner whatsoever.

### 2. **Public Announcements**

Customer agrees (i) that Vigilant may identify Customer as a recipient of Services and use Customer's name and logo in sales presentations, marketing materials and press , only with expressed prior written consent from Customer.

### 3. **Notices**

Except as otherwise expressly set forth in the Agreement, all notices, requests, consents, claims, demands, waivers and other communications under the Agreement have binding legal effect only if in writing and addressed to, in the

16

case of Customer, the name and address or email address identified on the Agreement or, in the case of Vigilant, to legalteam@vigilantnow.com or to such other address or such other person that such Party may designate from time to time in accordance with this paragraph. Notices sent in accordance with this paragraph shall be deemed effectively given: (a) when received, if delivered by hand, with signed confirmation of receipt; (b) when received, if sent by a nationally recognized overnight courier, signature required; (c) when sent, if by e-mail, (with confirmation of transmission), if sent during the addressee's normal business hours and on the next business day, if sent after the addressee's normal business hours; and (d) on the 5th day after the date mailed by certified or registered mail, return receipt requested, postage prepaid.

4. **Entire Agreement; Amendments; Waiver**

   The Agreement, including any other documents incorporated therein by reference, constitutes the sole and entire agreement of the Parties with respect to the subject matter of the Agreement and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter. The Agreement may be amended, modified or changed only by a writing signed by both Parties. The waiver of a breach of any provision of the Agreement will not operate or be interpreted as a waiver of any other or subsequent breach. In the event of any inconsistency between these Terms and the Agreement or between these Terms and any other documents incorporated herein by reference, the following order of precedence governs (other than an exception expressly set forth as such therein): (a) first, these Terms; (b) second, the Agreement; and (c) third, any other documents incorporated herein by reference.

5. **Non-Solicitation**

   During the Term and for two (2) years following the expiration or termination of any Agreement, Customer agrees not to: (i) directly or through others, solicit or attempt to solicit or hire any Vigilant Personnel; (ii) encourage Vigilant Personnel to terminate his or her relationship with Vigilant; or (iii) hire or directly contract Vigilant Personnel absent Vigilant's express prior written consent. The foregoing shall not prohibit engagements which result from general, non-targeted solicitations.

6. **Restrictive Covenant**

   Both Parties acknowledge that a breach or threatened breach of any of the restrictive covenants in the Agreement or the Terms would give rise to

17

irreparable harm to the Parties, for which monetary damages would not be an adequate remedy and each Party hereby agrees that in the event of a breach or a threatened breach by either Party or its Affiliates of any such obligations, the non-breaching Party shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

7. **Assignment**

Customer shall not assign, any portion of its rights, duties, or obligations under the Agreement without the prior written consent of Vigilant. Any purported assignment in violation of this section and shall be null and void. Customer agrees that Vigilant may subcontract services to be performed in connection with the Agreement; provided that any such subcontracting arrangement will not relieve Vigilant of any of its obligations hereunder. Vigilant shall not assign the Agreement, including its rights and duties hereunder, without the consent of Customer.

8. **Severability**

If any provision of the Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of the Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties hereto shall negotiate in good faith to modify the Agreement so as to affect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

9. **Governing Law and Jurisdiction**

The Agreement shall be solely and exclusively governed, construed and enforced in accordance with the Laws of the State of Delaware (without regard to the conflicts of Law provisions thereof).

10. **Waiver of Jury Trial**

Customer irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to the Agreement or the transactions contemplated hereby.

18

1928697v7

## 11. **No Third-Party Beneficiary**

No third party shall be deemed a third-party beneficiary of the Agreement. Any Customer Affiliate networks may be monitored under the Agreement as long as the Affiliate is wholly owned by Customer, the Affiliate is separately identified in the Agreement and the Affiliate network traffic passes through the same data pipe.

## 12. **Export Laws**

Export Laws of the United States and any other relevant local export Laws apply to the Software. Customer agrees that such export control Laws govern Customer's use of the Software and Services (including technical data) and any deliverables provided under the Agreement. Customer agrees to comply with all such export Laws (including "deemed export" and "deemed re-export" regulations). Customer agrees that no data, information, software programs and/or materials resulting from the Services (or direct product thereof) will be exported, directly or indirectly, in violation of such Laws, or will be used for any purpose prohibited by such Laws including, without limitation, nuclear, chemical, or biological weapons proliferation, or development of missile technology.

## 13. **Audit Rights**

Vigilant may, at its sole discretion, audit Customer's use of the Services during the Term. Customer agrees to cooperate in good faith with Vigilant's audit and provide reasonable assistance and access to all information Vigilant deems necessary to complete the audit. Any such audit shall not unreasonably interfere with Customer's normal business operations. If any audit produces use by Customer in excess of the Agreement, Customer agrees to pay, within thirty (30) days of written notification, any fees applicable to Customer's use of the Services in excess of its rights under the Agreement. If Customer does not pay such fees, Vigilant can, at its sole discretion, terminate the Services and/or the Agreement. Customer agrees that Vigilant shall not be responsible for any of Customer's costs incurred in cooperating with the audit.

## 14. **Non-Applicability of UCITA**

The Uniform Computer Information Transactions Act does not apply to the Agreement. Customer understands that Vigilant business partners, including any third-party firms retained by Customer to provide computer consulting services, are independent of Vigilant and are not Vigilant agents. Vigilant is not liable for nor bound by any acts of any such business partner, unless the business partner

19

is providing services as a Vigilant subcontractor on an engagement ordered under the Agreement.

15. **ADDITIONAL DEFINITIONS**

1. **"Affiliate"** of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the direct or indirect power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise/ownership of more than 50% of the voting securities of a Person.

2. **"Agreement"** means any document(s) executed by the Parties that contemplates, refers to, and/or otherwise incorporates these Terms, as they may be amended from time to time.

3. **"Authorized User"** means any employee or third-party user that requires access to the Software or Services and has been identified in writing by Customer to Vigilant and approved by Vigilant as being authorized to use the administrative components of the Software or Services.

4. **"Compromise"** means any Incident ranging from an individual/small-scale operation (e.g., insiders, suppliers and activists) to large-scale, organized efforts (e.g., perpetrated by criminal networks and foreign governments).

5. **"Customer Information"** means any information, records, data, or any other materials (in whatever form) entered into the Software by Customer, or otherwise provided to Vigilant by Customer, any of Customer's Authorized User, or any other employee, agent, contractor, or other representative of Customer.

6. **"Disclosing Party"** has the meaning set forth in Section 9.1.

7. **"Documentation"** means any manuals, instructions, or other documents or materials that Vigilant provides or makes available to Customer in any form or medium and which describe the functionality, components, features or requirements of the Services or Vigilant Materials, including any aspect of the installation, configuration, integration, operation, use, support or maintenance thereof.

8. **"Effective Date"** has the meaning set forth in the Agreement or if no date is identified, such it shall mean the date of the latest signature on the Agreement.

9. **"Forensic Data"** means any data identified by Vigilant in its sole discretion as malware or forensic data related to malware, including any data which contains embedded malware or is related to any Compromise or Incident.

10. **"Incident"** means the introduction of malicious software such as trojans, worms, viruses and spyware; password phishing; cyber-attack; cyber-intrusion; hacking; data breach; unauthorized access; denial of service; malware; bots; system Compromise or other computer security breach.

11. **"Incident Response"** has the meaning set forth in Section 5.3

20

12. **"Intellectual Property Rights"** means any and all registered and unregistered rights granted, applied for or otherwise now or hereafter in existence under or related to any patent, copyright, trademark, trade secret, database protection or other intellectual property rights Laws and all similar or equivalent rights or forms of protection, in any part of the world.

13. **"Law" or "Laws"** means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree or other requirement of any federal, state, local or foreign government or political subdivision thereof, or any arbitrator, court or tribunal of competent jurisdiction.

14. **"Parties"** means both Vigilant and Customer.

15. **"Party"** means either Vigilant or Customer individually.

16. **"Person"** means an individual, corporation, partnership, joint venture, limited liability entity, governmental authority, unincorporated organization, trust, association or other entity.

17. **"Personnel"** has the meaning set forth in Section 10.1.

18. **"Private Information"** means information comprising personally identifying or proprietary network information related to Customer and third parties that interact with Customer and Customer's or a third party's network equipment, files, databases, logs and other sources of information which may support the Services.

19. **"Process"** means to perform any operation or set of operations on any data, information, material, work, expression or other content, including to (a) collect, receive, input, upload, download, record, reproduce, store, organize, combine, log, catalog, cross-reference, manage, maintain, copy, adapt, alter, translate or make other improvements or derivative works, (b) process, retrieve, output, consult, use, disseminate, transmit, submit, post, transfer, disclose or otherwise provide or make available, or (c) block, erase or destroy.

20. **"Receiving Party"** has the meaning set forth in Section 9.1.

21. **"Software"** means Vigilant software application or applications and any third-party or other software and all new versions, updates, revisions, improvements and modifications of the foregoing, that Vigilant provides access to, use of, or uses as part of the Services or otherwise related to the Agreement.

22. **"Specifications"** means the specifications for the Services set forth in the Agreement and, to the extent consistent with and not limiting of the foregoing, the Documentation.

23. **"Terms"** has the meaning set forth in the preamble to this Agreement.

24. **"Threat Data"** has the meaning set forth in Section 4.1

25. **"User Data"** means any and all information reflecting the access or use of the Services by or on behalf of Customer or any Authorized User which is automatically collected or logged by Vigilant or a third party on Vigilant's behalf, including any end user profile-, visit-, session-, impression-, click through- or click

21

stream- data and any statistical or other analysis, information or data based on or derived from any of the foregoing.

26. **"Vigilant Materials"** means all devices, documents, data, know-how, methods, processes, software and other inventions, works, technologies and materials, including any and all Services, Software, Documentation, computer hardware, programs, reports and specifications, client software and deliverables that are proprietary to Vigilant and provided or used by Vigilant in connection with performing the Services.

*(Signatures on following page. Remainder of the page intentionally left blank.)*

22

1928697v7

**IN WITNESS WHEREOF**, the parties have executed this Agreement by and through their duly authorized agents as of the Effective Date.

**VIGILANT LLC**

By: _____

Name: Chris Nyhuis

Title: CEO

Email: cnyhuis@vigilantnow.com

Date: 2/10/2023

**HELZBERG'S DIAMOND SHOPS, LLC**

By: _____

Name: Art Silva

Title: CIO

Email: ARSilva@helzberg.com

Date: 2/10/2023

23

1928697v7

# Exhibit B

# Services Subscription Agreement



**◈VIGILANT**
7570 Bales St., Suite 250
Liberty Township, Ohio 45069

**Proposal Date:** February 13 2023      **Prepared For:** Helzberg Diamonds
**Proposal Expiration:** March 15 2023
**Prepared By:** Tim Martin

## Helzberg's Diamond Shops, LLC. And Vigilant SUBSCRIPTION AGREEMENT

This Helzberg's Diamond Shops, LLC and Vigilant Subscription Agreement is made by and between Helzberg's Diamond Shops, LLC d/b/a Helzberg Diamonds, a Missouri Limited Liability Company, ("Client", "Customer", "Company") and Vigilant LLC an Ohio Limited Liability Corporation ("Vigilant"). Company agrees to pay all monthly fees that are invoiced properly and consistently with the below. All Vigilant Services are subject to incur additional charges according to applicable Local, State and Federal Taxes. If Client improperly or fraudulently uses any Vigilant materials during the subscription period, Client shall bear all risk of loss arising therefrom. Client expressly authorizes and grants Vigilant the right to monitor all network and host-related traffic on Client networks and to retain a copy of all information captured by Vigilant on Client systems and networks consistent with Vigilant's Terms and Conditions. Such terms and conditions are located at https://vigilantnow.com/terms-conditions, and by signing this Subscription Agreement, Client agrees to such terms and conditions provided such Terms and Conditions shall not apply to the extent they are in conflict with the Vigilant Master Services Agreement as agreed to between the Parties and/or this Subscription Agreement.

Excepting any non-disclosure agreement or business associate agreement entered into between Client and Vigilant, which agreement(s) shall remain in effect pursuant to their express terms, this Agreement constitutes the entire agreement between the parties and any prior understanding or representation of any kind proceeding the date of this Agreement shall not be binding upon either party except to the extent incorporated into this Agreement. Both parties acknowledge that they have read and understand this Agreement, the products and services being delivered, and agree to be bound by its terms.

Your Contract Start Date will be established as the date that the Vigilant Subscription Letter was signed by Client and will continue for the Term identified below. Your initial invoice will be prorated back to the Contract Start Date.

This proposal is good for a period of 30 days from the date of the proposal.

Billing Schedule:
1) Implementation Service One Time Charge – This cost will be invoiced 1 business day from when the signed agreement is completed.
2) MDR Monthly Recurring Cost – The amount will be invoiced 5 business days from when the signed agreement is completed.

## VIGILANT SERVICES SUMMARY

| | |
|---|---|
| Network MNDR One Time Setup and Configuration Cost: | $ 25,802.00 |
| MEDR One Time Setup and Configuration Cost: | $ 1,000.00 |
| V365 One Time Setup and Configuration Cost: | $ 1,000.00 |
| **Total Implementation Cost:** | **$ 27,802.00** |
| | |
| Network MNDR Monthly Recurring Cost: | $ 3,714.30 |
| MEDR Monthly Recurring Cost: | $ 8,034.20 |
| V365 Monthly Recurring Cost: | $ 2,850.00 |
| **Total Monthly Recurring Cost:** | **$ 14,598.50** * See Note |

DocuSign Envelope ID: DC90D478-6BCD-4286-90A2-FC59BEEE0131

# Services Subscription Agreement

**VIGILANT**
7570 Bales St., Suite 250
Liberty Township, Ohio 45069

*Note:

* Vigilant Network MNDR: Final One Time Charge and Monthly Recurring Cost are subject to confirmation of the final installation's design.

* MEDR Service: Client is responsible for paying the contracted amount as stated and any increase on endpoint count over the original signed contract.

* Vigilant V365: Based on 1,900 Advanced Level Accounts. Final Monthly Recurring Cost is based on actual advanced level accounts.

## Services Subscription Agreement



**◈VIGILANT**

7570 Bales St., Suite 250
Liberty Township, Ohio 45069

### SUBSCRIPTION AGREEMENT SERVICES AND PRICING DETAIL

#### VIGILANT NETWORK MNDR

| Speed | Sensor Type | Site Location | QTY | MRC | Line Total |
|---|---|---|---|---|---|
| 100 Mbps | 2208 | DC | 1 | $ 2,184.88 | $ 2,184.88 |
| 100 Mbps | 2206 | DR | 1 | $ 2,184.88 | $ 2,184.88 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | **Total MRC:** | **$** | **4,369.77** |
| | | | Discount (15%): | $ | (655.47) |
| | | | | | |
| | | | **Adjusted MRC:** | **$** | **3,714.30** |
| | | | **Total Implementation Cost:** | **$** | **25,802.00** |

#### VIGILANT MEDR

| Protection Type | QTY | MRC | Line Total |
|---|---|---|---|
| MEDR Service | - | | $ - |
| Complete Service | 850 | $ 11.12 | $ 9,452.00 |
| IT Asset Compliance | - | | $ - |
| Vulnerability Management | - | | $ - |
| | **Total MRC:** | | **$ 9,452.00** |
| | Multiple Services & 3-Year Contract Discount (15.%): | | $ (1,417.80) |
| | **Adjusted MRC:** | | **$ 8,034.20** |
| | **Total Implementation Cost:** | | **$ 1,000.00** |

IMPORTANT: Client is responsible for paying the contracted amount as stated and any increase on endpoint count over the original signed contract.
MEDR complete service includes CrowdStrike Falcon software licensing for Next Gen AV, Insight EDR, Falcon Intelligence, Threat Graph, USB device control and host based FW.

#### VIGILANT V365 MONITORING

| Monitoring Type | QTY | MRC | Line Total |
|---|---|---|---|
| Advanced Level Accounts | 1,900 | $ 2.50 | $ 4,750.00 |
| | **Total MRC:** | | **$ 4,750.00** |
| | Discount (40%): | | $ (1,900.00) |
| | **Adjusted MRC:** | | **$ 2,850.00** |
| | **Total Implementation Cost:** | | **$ 1,000.00** |

# Services Subscription Agreement

**◆VIGILANT**
7570 Bales St., Suite 250
Liberty Township, Ohio 45069

## SERVICES SELECTION

Vigilant Service MNDR: 3 Year Term  Vigilant MEDR: 3 Year Term  Vigilant V365: 3 Year Term

## AGREEMENT SIGNATURES

By signing below, Client agrees to the terms of this proposal and will enter a contractual agreement with Vigilant.
In WITNESS WHEREOF, the parties have executed theis Subscription Agreement by and through their duly authorized agents as
of the Effective Date hereinbelow.

**Client - Helzberg Diamonds**

Name: Art Silva

Signature: *(DocuSigned by, E5F3F43F205F46E...)*

Title: CIO

Date: 2/15/2023

**Accounts Payable**

Contact:

Email:

Phone:

Address:
(if different from above)

**Vigilant LLC. – 7570 Bales St. Suite 250 Liberty Township, OH 45069**

Name: Chris Nyhuis

Signature: *(DocuSigned by, Ch2 /CEO, 32321C680B16424...)*

Title: CEO

Date: 2/15/2023

Form ver 12.0a

## Services Subscription Agreement



**VIGILANT**
7570 Bales St., Suite 250
Liberty Township, Ohio 45069

**ADDENDUM - SPECIAL PROVISIONS**

Provision 1: This section replaces section 5.1 "Term and Termination section of Vigilant's Term's and Conditions located at https://www.vigilantnow.com/serviceterms/ . The new language reads "The Agreement shall commence on the Effective Date and remain in effect for three (3) years from the Effective Date, Vigilant reserves the right to increase service and product rates at the time of renewal. The Initial Term and any Renewal Term are referred to collectively as, the "Term."

Provision 2: Vigilant will perform the physical installation of the sensors at no cost for up to Qty. 2 (two) sites. This clause only covers the resource cost for the installation onsite. Helzberg Diamonds is still responsible for the One Time Setup and Configurations costs as per the cost structure located in this Subscription Agreement. Note: Helzberg Diamonds will be responsible for any travel costs involved in installation. As per Vigilant's Terms and Conditions all travels costs will be submitted to Helzberg Diamonds for approval prior to incurring costs.

When Network Changes take effect, an addendum will be needed.

Under this Subscription Agreement, Vigilant provides unlimited incident response forensics at no additional cost to the Client for any incidents that originated in their environment while under Vigilant's protection. If an incident response is initiated and it is determined that the incident happened or was associated to an event that preceded Vigilant services, the client will incur an incident response service charge. The scope of the unlimited incident response forensics only applies to the capabilities of the services that Client subscribes to and only for network segments or endpoints with Vigilant services installed on. For example, if client subscribes to MNDR services and not MEDR then incident response forensics would only cover a Client's network and not endpoints and only on the segments of the Client network that MNDR is installed on. Unlimited incident response for MEDR only applies for Clients that subscribe to MEDR and choose Crowdstrike as the integration and endpoint tool. In order to be eligible for Vigilant's unlimited incident response coverage, Vigilant's implementations teams must certify client environment during the onboarding process of Vigilant services in client environment. Client will receive a certification document during this process. If it is found that client modified Vigilant services deployments post certification Vigilant, will not be obligated to honor unlimited incident response services and Client will be obligated to pay Vigilant for all incident response services provided to Client.

If Client's forensic investigation requirements are outside of subscribed services, Client may purchase incident response hours from Vigilant to cover said requirements. If the forensic investigation calls for additional data or information, the Client is responsible providing access to this data in a secure and timely manner.

When it comes time to removing a network sensor (e.g., due to site decom, services ending, etc.), the client must notify Vigilant prior to powering down and/or removing a sensor from their rack. Once Vigilant receives the notification from the client, the Vigilant team will decom the sensor from our end to ensure all sensitive Vigilant and client data is deleted prior to shipping and return to Vigilant. If a notification to decom the sensor is not sent to Vigilant, or the client powers down the sensor before Vigilant notifies Client that it is safe to power down, Client shall be responsible for any and all damages or liability that occur directly or related to the same (e.g., data loss, inadvertent data disclosure, confidentiality breach, etc.).

# Exhibit C



# Terms & Conditions

**These TERMS AND CONDITIONS** ("Terms") apply to and govern all products, Software and Services provided by Vigilant LLC and its Affiliates ("Vigilant") and any Person who uses any Vigilant products, Software and Services ("Customer"). Vigilant reserves the right to revise or otherwise modify these Terms at any time with or without notice to Customer. If revised or modified, the revised Terms will be posted on this website and will thereafter be immediately effective for all later agreements between Vigilant and Customer or any subscription agreements associated with any prior agreement entered into between the Parties.

**SERVICES**

1. **SUBSCRIPTION AGREEMENTS**

   1. Vigilant shall, in accordance with all terms and conditions set forth in the Agreement, provide Customer the services described in the Agreement ("Services").

   2. The Agreement will be effective only when signed by Customer and Vigilant. Any modifications or changes to any Agreement or the Services will be effective only by a written change order signed by both Parties.

2. **LIMITATIONS ON VIGILANT'S OBLIGATIONS**

   1. **Services are performed by internal team members of Vigilant.** Customer specifically acknowledges, however, that certain aspects of the Services may be impacted or controlled by third parties (i.e. an **ISP controls Internet connection and availability**), and actions or inactions by third parties can impair or disrupt **Vigilant's ability to perform** the Services. Vigilant will use commercially reasonable efforts to remedy and avoid any impaired or disrupted Services **and will notify Customer in the event Vigilant becomes aware of any such disruption.**



**Vigilant in such event.** Vigilant cannot and does not guarantee that the Services will not be impaired or disrupted by Customer or third parties. Customer acknowledges that its performance of all of its obligations under the Agreement is necessary for Vigilant's successful performance of the Services. Any failure by Customer to perform its obligations, that in Vigilant's reasonable judgment prevents or materially hinders Vigilant's performance of the Services, constitutes a material breach of the Agreement.

3. **CUSTOMER ENVIRONMENT**

Customer acknowledges that the configuration of Customer's environment may require Vigilant to alter the standard deployment of its Services and may affect the effectiveness or accuracy of the Services. Customer shall promptly notify Vigilant of any changes to its software, hardware, or configuration of the Customer environment that may impact Vigilant's performance of the Services. At times, Vigilant may make recommendations to Customer as part of Services that may require changes to Customer's environment. Customer is solely responsible for any changes made or not made to its environment during the term of any Agreement. Vigilant may monitor, intercept and review activities of Customer employees, contractors and other individuals with access to Customer IT resources and communications systems, including but not limited to email (both outgoing and incoming), instant messages and internet postings and activities. This might include, without limitation, the monitoring, intercepting, accessing, recording, disclosing, inspecting, reviewing, retrieving and printing of transactions, messages, communications, postings, log-ins, recordings and other uses of the systems as well as keystroke capturing and other network monitoring technologies. Vigilant may also store copies of such data and communications for a period of time. Customer consents to such activities by Vigilant.

4. **USER DATA AND FORENSIC DATA RETENTION AND PRIVACY**

1. Your signature below expressly grants Vigilant the right to monitor all network and host related traffic on Customer networks and to retain a copy of all information captured by Vigilant from Customer systems and networks ("Captured Data").



"Threat Data." Customer grants Vigilant, a worldwide, perpetual, irrevocable, non-exclusive, royalty-free license to duplicate, sell, transmit, publish, modify, distribute, publicly display, summarize, alter, compile and create derivative works of any Threat Data. Before sharing Threat Data with a third party, Vigilant will undertake commercially reasonable and good faith efforts to determine if any Customer Confidential Information is contained in or attached to the Threat Data and, if so, will undertake the following steps before proceeding:

1. undertake reasonable efforts to remove Customer Confidential Information from the Threat Data unless required to remain for analysis by Vigilant or as required by law; and

2. except as required by law, before Threat Data that includes Customer Confidential Information is submitted to any third party, Vigilant will provide Customer the full submission sample for Customer's prior approval.

2. Vigilant may be exposed to or collect the Private Information of Customer and Customer employees, contractors and agents during its performance of Services or its retention of Forensic Data. To the extent Vigilant is exposed to or collects Private Information or Customer provides Private Information to Vigilant, it shall be Customer's responsibility to identify such information and ensure both Parties' compliance with regard to all applicable privacy Laws, regulations and restrictions, including all data privacy Laws and all related license requirements. Customer represents and warrants that (i) it has obtained all necessary permissions and documents, including consent forms, licenses, agreements and certifications, necessary for Vigilant to perform the Services in a manner consistent with Law; and (ii) Customer complies with all applicable laws for processing and transferring Customer Information to Vigilant. Vigilant may disclose Customer Information, including Private Information and Confidential Information, where Vigilant reasonably believes it is required by law to make such disclosure.

5. **ALERTING AND REPORTING**



to Customer pursuant to the Agreement, or according to the Service Level Agreement Response Times outlined in 5.2. If Vigilant determines that an alert is a "false positive" or that it otherwise poses no legitimate threat to Customer's environment, Vigilant shall have no obligation. to provide an alert analysis.

2. Service Level Agreement Response Times:

    1. Critical – (Covers Identified or imminent /critical threat(s) to an organization's Mission Critical systems and any critical P1 down operational outages that require immediate resolution 24x7). Critical Issues on inbound/outbound issues carry an immediate to 2 hours response time. On Critical issues Vigilant will host an open ended conference bridge to collaborate and provide continuous interaction until resolution.

    2. High – (Covers Potential threat(s) to an organization and any Potential operational outage or service outage to user(s) or Mission Critical Systems). The response time for this High level events is 4 hours 24x7.

    3. Medium – Any general change request of a non-critical nature however is considered medium level. The response time for this level is 8 hours and is available M-F.

    4. Low – Low priority change requests and or information changes and needs are considered to be low level response. Our response time is 24 hours in this category, Monday through Friday only.

3. Communicating initial threat information will be via phone, email, or a unique Customer portal. Alert details will only contain information available to Vigilant. For example, actual source IP address for an alert may be obscured from Vigilant by infrastructure within the customer environment such as proxy servers. Determination of actual source of an alert may require additional investigation by the Customer and Vigilant. Analysis performed beyond alert notification is considered "Incident Response." Unless expressly stated in the Agreement, Vigilant is not responsible to provide Incident Response.



1. Customer agrees that it has authorized Vigilant to perform penetration testing against their owned applications and warrants Customer has authority to request such services. This testing will include various types of network and application based attacks and can included scanning of all Customer systems, to attack Customer infrastructure for the purposes of identifying information security vulnerabilities in service of the Customer, to perform conduct within and outside of the Customer infrastructure that would otherwise be illegal activity if not already expressly permitted by Customer and to provide any other services to Customer as identified in any statement of work or as described in the invoice above (collectively, the "Services"). The work will be performed remotely and no physical access to the client environment will be needed. The deliverable of the penetration test report will be delivered no more than 2 weeks after the test completion date

2. Additional Penetration Testing Indemnification

   1. Customer acknowledges and accepts that Vigilant, in its performance of the Services, may possibly harm or otherwise interfere with Customer infrastructure, systems, data, or property. Customer, on behalf of itself and its successors, assigns and other legal representatives, hereby absolutely, unconditionally and irrevocably covenant and agree that it will hold Vigilant harmless and will not sue Vigilant (at law, in equity or otherwise) for any harm or loss incurred by Customer that arises or in any way relates to Vigilant's provision of the Services, except for any such actions by Vigilant that are held to be negligent or reckless by a court of appropriate jurisdiction. Customer agrees to indemnify and hold Vigilant harmless for any liability, loss, cost, damage or expense, including reasonable attorney's fees, resulting from third-party claims against Vigilant when inaccurate information or direction provided by Customer causes Vigilant to take any action in performing the Services that violate applicable law, contract or any third-party's rights. Customer acknowledges that Vigilant is engaged in



3. Data Exfiltration

   1. Any sensitive data located will be documented and testing will be performed to see if the data can be transferred undetected to the test machine's encrypted hard drive.

   2. Sensitive data will be handled under the proper requirements governed by the Customer's compliance requirements.

   3. Any Sensitive data will be destroyed post assessment and a document of destruction will be given to the Customer on the completion of the assessment.

4. Clean Up Installed Software and Tools

   1. The tester will remove any software or other artifacts used during testing so that the systems are all returned to their pre-test state.

5. Customer Requirements

   1. Customer will guarantee that all sites and systems designated for scanning are available. If delay is caused by the site(s) or systems not being ready additional charges will apply at a rate of $500.00 per resource. If this takes place Vigilant project manager and Customer contact will work to agree upon a reasonable and mutually acceptable time to reschedule work.

   2. It may be required for the Customer to provide Hardware or Software to Vigilant in order for Vigilant to perform an accurate and complete test. If Hardware or Software from the Customer are required the request will be made by Vigilant to the Customer in writing. All hardware and software provided by Customer will be assumed to be good and in working order. Customer is responsible for all software licensing requirements, software compatibility with hardware or hardware requirements by software and its functionality if applicable. All software and hardware will be returned to the client after the assessment. If the assessment includes destruction of the hardware or software Customer acknowledges that the hardware and



6. Assessment Hours

    1. Unless otherwise defined all assessment work will be performed during normal business hours 8-5 M-F unless designated in writing by Customer. Customer will designate a single point of contact to whom all Vigilant communications may be addressed and who has the authority to act on all aspects of the services throughout the duration of the project; such contact shall be available during normal hours of business (Monday through Friday, 8:00am to 5:00pm local site time, excluding holidays)

**GRANT OF LICENSE**

1. **LICENSE GRANT**

Vigilant grants to Customer, exercisable solely by Authorized Users, a non-exclusive and non-transferable right and license to use the Software and Services during the Term. Customer shall use the Software and Services solely for internal business purposes and as set forth in the Agreement. Customer shall have transfer, assignment or sublicense rights absent express written consent from Vigilant. Customer acknowledges and agrees that Customer is solely responsible for ensuring that Authorized Users comply with the Agreement and Customer shall be solely responsible for any breach of the Agreement due to the action or inaction of any Authorized User or of any employee, agent, customer, or contractor of Customer. Customer shall and shall not permit any third party to: (i) remove of modify any markings or reference to Vigilant or its licensors' proprietary rights from Vigilant Software or Services; (ii) make the Software, Services, or any materials thereof available in any manner to any third party for use in the third party's business operations; (iii) download, reproduce, copy, republish, alter, adapt, modify, improve, translate, create derivative works from, reverse engineer any part of the Services or Software, disassemble, decompile or otherwise attempt to reveal the trade secrets, know-how, or other Intellectual Property Rights underlying or included in the Software or Services; (iv) access or use the Software or Services in order to build or support and/or assist a third party in building or supporting, products or



time-sharing, or otherwise commercially exploit or make the Services, Software, or related materials available to any third party; or (vii) otherwise use the Services or Software not in accordance with the Agreement. Upon expiration or termination of the Agreement, for any reason, Customer's right to access or use the Software and Services shall immediately terminate.

## 2. LICENSE RESTRICTIONS

Vigilant will assign to each Authorized User a unique password and identification name ("Authorized User Credentials"). Authorized User Credentials allow the Authorized User to access the administrative components of the Software and Services. Customer must immediately inform Vigilant if it discovers or reasonably believes that Authorized User Credentials or any other security mechanism issued by Vigilant is lost or forgotten, has or is likely to become known to someone not authorized to use it or is being or is likely to be used in an unauthorized way. In such an event, Customer must complete such security checks as Vigilant deems appropriate. Vigilant reserves the right to suspend access to the Software and Services if at any time Vigilant considers that there is or is likely to be a breach of security or if Customer fails to comply with Vigilant's instructions or requests in relation to security matters.

## 3. LIMITED LICENSE FORM THIRD PARTIES

Vigilant may use software/hardware for the Services that are subject to shrink-wrap, click-through, on-screen, open source, or similar licensing arrangements that Customer must timely accept during Vigilant performance of the Services. Vigilant shall obtain Customer's approval prior to accepting the terms of such agreements on behalf of Customer if acceptance of such agreement will require payment from Customer. Where applicable, Vigilant will convey to Customer the requisite license rights to software used by Vigilant to provide the Services. Customer shall either directly pay all costs of all such software/hardware, including all licensing fees, or promptly reimburse Vigilant for all such costs.



packages. This open source software is governed by the terms and conditions of the applicable open source license and Customer agrees that it will be bound by the terms and conditions of the applicable open source license in connection with its use and distribution of the open source software in the Software and Services. The open source software, the applicable open source licenses and other open source notices will be made available upon request.

## 5. TERM AND TERMINATION

### 1. TERM AND RENEWAL

The Agreement shall commence on the Effective Date and remain in effect for the term identified in the Agreement (the "Initial Term"). If no Initial Term is identified in the Agreement, the Initial Term shall be deemed to be three (3) years from the Effective Date and shall automatically renew for successive three (3) year periods (each a "Renewal Term"), unless either Party gives at least ninety (90) days prior written notice of intent to cancel to the other Party before the expiration of the then current term in effect (including the Initial Term or any Renewal Term, as the case may be). Vigilant reserves the right to increase service and product rates at the time of renewal. The Initial Term and any Renewal Term are referred to collectively as, the "Term."

### 2. TERMINATION

Vigilant may terminate the Agreement immediately if in Vigilant's sole discretion Customer misuses the Software or Services, engages in illegal practices, or otherwise materially breaches the Agreement. Vigilant may also terminate the Agreement at any time, for any cause, upon thirty (30) days prior written notice. Customer may terminate the Agreement if Vigilant materially breaches the terms of the Agreement and fails to cure such breach within thirty (30) days of written notice.

### 3. EFFECT OF TERMINATION OR EXPIRATION



1. Customer shall immediately cease use of all Vigilant Materials and Confidential Information.

2. Subject to continuing rights, licenses and obligations of either Party under the Agreement, all licenses granted hereunder will immediately terminate and the Parties shall cease all activities concerning, including all use of, in the case of Customer, the expired or terminated Services and/or Software and related Vigilant Materials and, in the case of Vigilant, the Customer Information.

3. Vigilant shall immediately cease use of Customer's Confidential Information except to the extent that such Confidential Information is, in Vigilant's reasonable opinion, inseparable from the Forensic Data Vigilant is entitled to retain and use under the Agreement. In such circumstances, Vigilant shall have no obligation to cease use of or destroy the inseparable Confidential Information.

4. Customer shall pay to Vigilant, (i) all charges and amounts due and payable to Vigilant, if any, for Services performed under the terminated or expired Agreement; (ii) all reimbursements for costs/expenses incurred by Vigilant during the term of the Agreement; (iii) any deferred payments; (iv) 100% of any rate reduction or discount previously granted if the Agreement or any Agreement is terminated before the end of the Term. Customer shall not be entitled to any refund of any payments made by Customer.

5. Each Party shall, at the other Party's option and upon its written request and subject to any retention rights in the Agreement: (i) promptly return or destroy and erase from all systems it directly or indirectly uses or controls all originals and copies of all of the other Party's Confidential Information; and (ii) provide a written statement to the other Party certifying that it has complied with the requirements of this section.

6. **SURVIVAL**



expiration or termination of the Agreement: Section 3.3, Section 4, Section 6, Section 7, Section 8, Section 9, Section 10, Section 12 and Section 13.

## 7. FEES, TAXES and EXPENSES

1. Subject to the terms of the Agreement, Customer shall pay the fees set forth in the Agreement, which shall be determined and invoiced by Vigilant in accordance with the rates, pricing and discounts set forth in the Agreement ("Fees").

2. All Fees and amounts set forth in the Agreement are exclusive of taxes. Customer shall be solely responsible for all sales, service, value-added, use, excise, consumption and any other taxes, duties and charges of any kind, if any, imposed by any governmental entity on any amounts payable by Customer under the Agreement, other than any taxes imposed on, or with respect to, Vigilant income, revenues, gross receipts, personnel, real or personal property or other assets.

3. Customer shall reimburse Vigilant for direct, documented, out-of-pocket expenses incurred by Vigilant in performing the Services, provided that Customer shall only be obligated to reimburse Vigilant for travel and lodging expenses approved in advance by Customer.

## 8. OWNERSHIP

### 1. CUSTOMER INFORMATION

Customer will provide Customer Information to Vigilant in connection with the Agreement and Services. Customer will remain the sole and exclusive owner of all right, title and interest in and to all Customer Information, including all Intellectual Property Rights relating thereto, subject only to the licenses granted in the Agreement. Subject to the terms and conditions of the Agreement, Customer hereby grants Vigilant a limited, royalty-free, fully-paid up, non-exclusive, transferable and sublicensable license to Process the Customer Information solely as reasonably necessary to provide the Services and as



## 2. VIGILANT MATERIALS

Vigilant is and will remain the sole and exclusive owner of all right, title and interest in and to the Vigilant Materials, including all Intellectual Property Rights relating thereto, subject only to any license expressly granted to Customer in the Agreement. Excepting any limited license expressly provided in the Agreement, nothing contained in the Agreement shall be construed as granting Customer, or any third party, any right, title, or interest in or to any Vigilant Materials, in each case whether by implication, estoppel or otherwise.

## 9. CONFIDENTIALITY

### 1. CONFIDENTIAL INFORMATION

In connection with the Agreement and Services, each Party (as the "Disclosing Party") may disclose or make available Confidential Information to the other Party (as the "Receiving Party"). Subject to the exclusions listed below, "Confidential Information" means information in any form or medium (whether oral, written, electronic or other) that the Disclosing Party reasonably considers confidential or proprietary, including information consisting of or relating to the Disclosing Party technology, trade secrets, know-how, business operations, plans, strategies, customers and pricing and information with respect to which the Disclosing Party has contractual or other confidentiality obligations that is either marked, designated or otherwise identified as "confidential" or that should reasonably be understood to be confidential considering the circumstances of its disclosure. Without limiting the foregoing, (i) all Customer Information is and will remain the Confidential Information of Customer and (ii) all Vigilant Materials including the Software, Specifications and Documentation are and will remain the Confidential Information of Vigilant and (iii) the terms of the Agreement are the Confidential Information of Vigilant.

### 2. EXCLUSIONS



made available to the Receiving Party in connection with the Agreement; (ii) was or becomes generally known by the public other than by the Receiving Party's or any of its employees, agents, contractors, or other representatives' noncompliance with the Agreement; (iii) was or is received by the Receiving Party on a non-confidential basis from a third party that was not or is not, at the time of such receipt, under any obligation to maintain its confidentiality; or (iv) was or is independently developed by the Receiving Party without reference to or use of any Confidential Information.

### 3. SAFEGUARD

As a condition to being provided with any disclosure of or access to Confidential Information, the Receiving Party (i) shall not access or use, or permit the access or use of Confidential Information other than as necessary to exercise its rights or perform its obligations under and in accordance with or as expressly authorized by the Agreement and (ii) shall safeguard the Confidential Information from unauthorized use, access or disclosure using at least the degree of care it uses to protect its own similarly sensitive information and in no event less than a reasonable degree of care.

### 4. COMPELLED DISCLOSURES

If the Receiving Party or any of its representatives is compelled by applicable Law to disclose any Confidential Information then, to the extent permitted by applicable Law, the Receiving Party shall: (i) promptly and prior to such disclosure, notify the Disclosing Party in writing of such requirement so that the Disclosing Party can seek a protective order or other remedy, or waive its rights; and (ii) provide reasonable assistance to the Disclosing Party, at the Disclosing Party's sole cost and expense, in opposing such disclosure or seeking a protective order or other limitations on disclosure. If the Disclosing Party waives compliance or, after providing the notice and assistance required under this paragraph, the Receiving Party remains required by law



Disclosing Party's request, shall use commercially reasonable efforts to obtain assurances from the applicable court or other presiding authority that such Confidential Information will be afforded confidential treatment. No such compelled disclosure by the Receiving Party will otherwise affect the Receiving Party's obligations hereunder with respect to the Confidential Information so disclosed.

### 10. **INDEMNIFICATION**

1. Customer shall indemnify, hold harmless and defend Vigilant and its managers, officers, directors, employees, agents, Affiliates, contractors, successors and assigns, from and against any losses, damages, liabilities, deficiencies, claims, actions, suits, judgments, settlements, interest, awards, penalties, fines, costs or expenses of whatever kind, including professional fees and reasonable attorneys' fees incurred by Vigilant that arise out of any direct or third-party claim alleging: (i) breach or non-fulfillment of any representation, warranty, or covenant this Agreement by Customer or its managers, officers, directors, employees, agents, Affiliates, contractors, successors and assigns ("Personnel"); (ii) any negligent or more culpable act or omission of Customer or its Personnel (including any reckless or willful misconduct) in connection with the performance of its obligations under this Agreement; (iii) any use of Customer systems by Vigilant consistent with the Agreement that results in the infringement of any Intellectual Property Rights or other privacy violations; (iv) any bodily injury, death of any person, or damage to real or tangible personal property caused by the negligent or more culpable acts or omissions of Customer or its Personnel (including any reckless or willful misconduct); or (v) any failure by Customer to comply with any applicable federal, state, or local laws, regulations, or codes in the performance of its obligations under this Agreement.

2. If Vigilant believes or it is determined that any of the Software may have violated a third party's Intellectual Property Rights,



1. modify or replace the Software to be non-infringing (while substantially preserving its utility or functionality);

2. obtain for Customer a license to allow for continued use of the Software; or

3. end the relevant license, terminate Customer's access to the Software, refund any prepaid fees not yet earned and terminate the Agreement.

Vigilant is not obligated to take any of the above-described actions to the extent claims or actions are based on or result from: (i) modifications or alterations of the Software by Customer; (ii) use of the Software outside the scope of use identified in the Agreement or in Vigilant's user Documentation or policies; or (iii) the combination of the Software with any products or services not provided by Vigilant.

## 11. **LIMITATION OF LIABILITY**

IN NO EVENT WILL VIGILANT BE LIABLE UNDER THE AGREEMENT FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES EVEN IF ADVISED OF OR MADE AWARE OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL VIGILANT'S LIABILITY UNDER THE AGREEMENT EXCEED THE FEES FOR SERVICES PAID BY CUSTOMER UNDER THE AGREEMENT IN THE ONE (1) YEAR PRECEDING THE EVENT GIVING RISE TO THE CLAIM.

## 12. **REPRESENTATIONS AND WARRANTIES; DISCLAIMER.**

1. Each Party represents and warrants to the other Party that (i) it is duly organized, validly existing and in good standing as a corporation or other entity under the Laws of the jurisdiction of its incorporation or other organization, (ii) it has the full right, power and authority to enter into and perform its obligations and grant the rights, licenses, consents and authorizations it grants or is required to grant under the Agreement. (iii) the execution of the Agreement by its representative whose signature is set forth at the end of the Agreement has been duly authorized by all



Party, enforceable against such Party in accordance with its terms. Customer further represents, warrants and covenants that Customer owns or otherwise has and will have the necessary rights and consents in and relating to the Customer Information so that, as received by Vigilant and used in accordance with the Agreement, they do not and will not infringe, misappropriate or otherwise violate any Intellectual Property Rights, any privacy, or other rights of any third party or violate any applicable law.

2. **DISCLAIMER OF WARRANTIES**

EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS SECTION, ALL SERVICES AND VIGILANT MATERIALS ARE PROVIDED "AS IS" AND VIGILANT HEREBY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE and VIGILANT SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT and ALL WARRANTIES ARISING FROM COURSE OF DEALING, USAGE OR TRADE PRACTICE. WITHOUT LIMITING THE FOREGOING, VIGILANT MAKES NO WARRANTY OF ANY KIND THAT THE SERVICES OR VIGILANT MATERIALS, OR ANY PRODUCTS OR RESULTS OF THE USE THEREOF, WILL MEET CUSTOMER'S OR ANY OTHER PERSON'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION, ACHIEVE ANY INTENDED RESULT, BE COMPATIBLE OR WORK WITH ANY SOFTWARE, SYSTEM OR OTHER SERVICES, BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE OR ERROR FREE, OR THAT THE SOFTWARE OR SERVICES WILL PROTECT CUSTOMER AGAINST ALL POSSIBLE SECURITY THREATS, INCLUDING INTENTIONAL MISCONDUCT BY THIRD PARTIES OR BY CUSTOMER OR CUSTOMER'S PERSONNEL. ALL THIRD-PARTY MATERIALS ARE PROVIDED "AS IS" AND ANY REPRESENTATION OR WARRANTY OF OR CONCERNING ANY THIRD-PARTY MATERIALS IS STRICTLY BETWEEN CUSTOMER AND THE THIRD-PARTY OWNER OR DISTRIBUTOR OF THE THIRD-PARTY MATERIALS.

3. Customer agrees to comply with the requirements of all applicable laws, rules and regulations in connection with the



termination of the Services without notice to Customer.

4. Customer agrees that Vigilant is not responsible for any delays caused by Customer. Customer further recognizes that the Software and Services involve a risk of loss of or disruption to Internet services, network services, electronic communications, information, Customer Information and data, including, but not limited to, third party access to the foregoing in a manner that may have adverse business consequences for Customer. Customer assumes all risk of loss of, or disruption to, the foregoing and hereby releases Vigilant and its Affiliates from any liability for any such loss including, but not limited to (i) the use or inability to use the Software or any system or application; (ii) any infringement or claim of infringement of a copyright, patent or other Intellectual Property Right allegedly implicated by the Software or Services or any other software acquired in connection with the Services; (iii) any loss of or changes to Customer Information or other data, or the inaccuracy of Customer Information or other data; (iv) the content of Customer Information; (v) delays or failures to perform any obligations hereunder due to a Force Majeure event; (vi) impairments to the Services caused by acts within the control of the Customer, its employees, or its agents; (vii) interoperability of specific Customer applications or systems; (viii) Customer's inability to access or interact with other providers or their services through the Internet; (ix) performance impairments caused on the Internet; (x) the cost of substitute goods, services, or technology; and/or (xi) any business loss, including, but not limited to, lost profits.

5. Customer specifically acknowledges that each type of information security threat or attack presents unique challenges, not all of which are related to technology (e.g., some security breaches may be due to human factors such as an employee divulging their password) and that Vigilant cannot be responsible for monitoring or analyzing items that are not specifically outlined in the Agreement.



originated in their environment while under Vigilant's protection. If an incident response is initiated and it is determined that the incident happened, or was associated to an event that preceded Vigilant services, The Customer will incur an incident response service charge. The scope of the unlimited breach response forensics only applies to the capabilities of the services The Customer subscribes to and only for network segments, or endpoints, with Vigilant services installed on them. For example, if The Customer subscribes to MNDR services and not MEDR then incident response forensics would only cover a Customer network and not endpoints and only on the segments of The Customer network(s) traffic that MNDR is configured to monitor. Unlimited breach response for MEDR only applies for Customers that subscribe to MEDR and choose Crowdstrike as the integration and endpoint tool. In order to be eligible for Vigilant's unlimited breach response coverage, Vigilant's implementation teams must certify client environment during the onboarding process of Vigilant services in client environment. Customer will receive a certification document during this process. If it is found that client modified Vigilant service deployments post certification, Vigilant will not be obligated to honor unlimited breach response services and The Customer will be obligated to pay Vigilant for all incident response services provided to Customer.

If the Customer's forensic investigation requirements are outside of subscribed services, The Customer may purchase incident response hours from Vigilant to cover said requirements. If the forensic investigation calls for additional data or information, the Customer is responsible for providing access to this data in a secure and timely manner.

## 13. FORCE MAJEURE

In no event will Vigilant be liable or responsible to Customer, or be deemed to have defaulted under or breached the Agreement, for any failure or delay in fulfilling or performing any term of the Agreement, when and to the extent such failure or delay is caused by any circumstances beyond Vigilant's reasonable control, including acts of



stoppages or slowdowns or other industrial disturbances, passage of Law or any action taken by a governmental or public authority, including imposing an embargo, export or import restriction, quota or other restriction or prohibition or any complete or partial government shutdown, or national or regional shortage of adequate power or telecommunications or transportation.

## 14. **MICELLANEOUS**

### 1. **Relationship of the Parties**

The relationship between the Parties is that of independent contractors. Nothing contained in the Agreement shall be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment or fiduciary relationship between the Parties and neither Party shall have authority to contract for or bind the other Party in any manner whatsoever.

### 2. **Public Announcements**

Customer agrees (i) that Vigilant may identify Customer as a recipient of Services and use Customer's name and logo in sales presentations, marketing materials and press releases and (ii) to develop a brief Customer profile for use by Vigilant for promotional purposes on any promotional materials, including web sites and social media, owned and/or controlled by Vigilant.

### 3. **Notices**

Except as otherwise expressly set forth in the Agreement, all notices, requests, consents, claims, demands, waivers and other communications under the Agreement have binding legal effect only if in writing and addressed to, in the case of Customer, the name and address or email address identified on the Agreement or, in the case of Vigilant, to legalteam@vigilantnow.com or to such other address or such other person that such Party may designate from time to time in accordance with this paragraph. Notices sent in accordance with this paragraph shall be deemed



when sent, if by e-mail, (with confirmation of transmission), if sent during the addressee's normal business hours and on the next business day, if sent after the addressee's normal business hours; and (d) on the 5th day after the date mailed by certified or registered mail, return receipt requested, postage prepaid.

4. **Entire Agreement; Amendments; Waiver**

The Agreement, including any other documents incorporated therein by reference, constitutes the sole and entire agreement of the Parties with respect to the subject matter of the Agreement and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter. The Agreement may be amended, modified or changed only by a writing signed by both Parties. The waiver of a breach of any provision of the Agreement will not operate or be interpreted as a waiver of any other or subsequent breach. In the event of any inconsistency between these Terms and the Agreement or between these Terms and any other documents incorporated herein by reference, the following order of precedence governs (other than an exception expressly set forth as such therein): (a) first, these Terms; (b) second, the Agreement; and (c) third, any other documents incorporated herein by reference.

5. **Non-Solicitation**

During the Term and for two (2) years following the expiration or termination of any Agreement, Customer agrees not to: (i) directly or through others, solicit or attempt to solicit or hire any Vigilant Personnel; (ii) encourage Vigilant Personnel to terminate his or her relationship with Vigilant; or (iii) hire or directly contract Vigilant Personnel absent Vigilant's express prior written consent.

6. **Restrictive Covenant**

Customer acknowledges that a breach or threatened breach of any of the restrictive covenants in the Agreement or these Terms would give rise to irreparable harm to Vigilant, for which monetary



addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

## 7. **Assignment**

Customer shall not assign, delegate, or subcontract any portion of its rights, duties, or obligations under the Agreement without the prior written consent of Vigilant. Any purported assignment in violation of this section and shall be null and void. Customer agrees that Vigilant may subcontract services to be performed in connection with the Agreement; provided that any such subcontracting arrangement will not relieve Vigilant of any of its obligations hereunder. Vigilant may assign the Agreement, including its rights and duties hereunder, without the consent of Customer.

## 8. **Severability**

If any provision of the Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of the Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties hereto shall negotiate in good faith to modify the Agreement so as to affect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

## 9. **Governing Law and Jurisdiction**

The Agreement shall be solely and exclusively governed, construed and enforced in accordance with the Laws of the State of Ohio (without regard to the conflicts of Law provisions



Agreement and hereby waive the affirmative defenses of lack of personal jurisdiction, lack of venue and forum non-conveniens.

### 10. Waiver of Jury Trial

Customer irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to the Agreement or the transactions contemplated hereby.

### 11. No Third-Party Beneficiary

No third party shall be deemed a third-party beneficiary of the Agreement. Any Customer Affiliate networks may be monitored under the Agreement as long as the Affiliate is wholly owned by Customer, the Affiliate is separately identified in the Agreement and the Affiliate network traffic passes through the same data pipe.

### 12. Export Laws

Export Laws of the United States and any other relevant local export Laws apply to the Software. Customer agrees that such export control Laws govern Customer's use of the Software and Services (including technical data) and any deliverables provided under the Agreement. Customer agrees to comply with all such export Laws (including "deemed export" and "deemed re-export" regulations). Customer agrees that no data, information, software programs and/or materials resulting from the Services (or direct product thereof) will be exported, directly or indirectly, in violation of such Laws, or will be used for any purpose prohibited by such Laws including, without limitation, nuclear, chemical, or biological weapons proliferation, or development of missile technology.

### 13. Audit Rights

Vigilant may, at its sole discretion, audit Customer's use of the Services during the Term. Customer agrees to cooperate in good



Customer's normal business operations. If any audit produces use by Customer in excess of the Agreement, Customer agrees to pay, within thirty (30) days of written notification, any fees applicable to Customer's use of the Services in excess of its rights under the Agreement. If Customer does not pay such fees, Vigilant can, at its sole discretion, terminate the Services and/or the Agreement. Customer agrees that Vigilant shall not be responsible for any of Customer's costs incurred in cooperating with the audit.

## 14. **Non-Applicability of UCITA**

The Uniform Computer Information Transactions Act does not apply to the Agreement. Customer understands that Vigilant business partners, including any third-party firms retained by Customer to provide computer consulting services, are independent of Vigilant and are not Vigilant agents. Vigilant is not liable for nor bound by any acts of any such business partner, unless the business partner is providing services as a Vigilant subcontractor on an engagement ordered under the Agreement.

## 15. **ADDITIONAL DEFINITIONS**

1. **"Affiliate"** of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the direct or indirect power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise/ownership of more than 50% of the voting securities of a Person.

2. **"Agreement"** means any document(s) executed by the Parties that contemplates, refers to, or otherwise incorporates these Terms, as they may be amended from time to time.

3. **"Authorized User"** means any employee or third-party user that requires access to the Software or Services and has been identified in writing by Customer to Vigilant and approved by



individual/small-scale operation (e.g., insiders, suppliers and activists) to large-scale, organized efforts (e.g., perpetrated by criminal networks and foreign governments).

5. **"Customer Information"** means any information, records, data, or any other materials (in whatever form) entered into the Software by Customer, or otherwise provided to Vigilant by Customer, any of Customer's Authorized User, or any other employee, agent, contractor, or other representative of Customer.

6. **"Disclosing Party"** has the meaning set forth in Section 7.1.

7. **"Documentation"** means any manuals, instructions, or other documents or materials that Vigilant provides or makes available to Customer in any form or medium and which describe the functionality, components, features or requirements of the Services or Vigilant Materials, including any aspect of the installation, configuration, integration, operation, use, support or maintenance thereof.

8. **"Effective Date"** has the meaning set forth in the Agreement or if no date is identified, such it shall mean the date of the latest signature on the Agreement.

9. **"Forensic Data"** means any data identified by Vigilant in its sole discretion as malware or forensic data related to malware, including any data which contains embedded malware or is related to any Compromise or Incident.

10. **"Incident"** means the introduction of malicious software such as trojans, worms, viruses and spyware; password phishing; cyber-attack; cyber-intrusion; hacking; data breach; unauthorized access; denial of service; malware; bots; system Compromise or other computer security breach.

11. **"Incident Response"** has the meaning set forth in Section 1.5.

12. **"Intellectual Property Rights"** means any and all registered and unregistered rights granted, applied for or otherwise now or hereafter in existence under or related to any patent, copyright, trademark, trade secret, database protection or other intellectual property rights Laws and all similar or equivalent rights or forms of protection, in any part of the world.

Terms & Conditions | Vigilant



government or political subdivision thereof, or any arbitrator, court or tribunal of competent jurisdiction.

14. **"Parties"** means both Vigilant and Customer.

15. **"Party"** means either Vigilant or Customer individually.

16. **"Person"** means an individual, corporation, partnership, joint venture, limited liability entity, governmental authority, unincorporated organization, trust, association or other entity.

17. **"Personnel"** has the meaning set forth in Section 8.1.

18. **"Private Information"** means information comprising personally identifying or proprietary network information related to Customer and third parties that interact with Customer and Customer's or a third party's network equipment, files, databases, logs and other sources of information which may support the Services.

19. **"Process"** means to perform any operation or set of operations on any data, information, material, work, expression or other content, including to (a) collect, receive, input, upload, download, record, reproduce, store, organize, combine, log, catalog, cross-reference, manage, maintain, copy, adapt, alter, translate or make other improvements or derivative works, (b) process, retrieve, output, consult, use, disseminate, transmit, submit, post, transfer, disclose or otherwise provide or make available, or (c) block, erase or destroy.

20. **"Receiving Party"** has the meaning set forth in Section 7.1.

21. **"Software"** means Vigilant software application or applications and any third-party or other software and all new versions, updates, revisions, improvements and modifications of the foregoing, that Vigilant provides access to, use of, or uses as part of the Services or otherwise related to the Agreement.

22. **"Specifications"** means the specifications for the Services set forth in the Agreement and, to the extent consistent with and not limiting of the foregoing, the Documentation.

23. **"Terms"** has the meaning set forth in the preamble.

24. **"Threat Data"** has the meaning set forth in Section 1.4.



Vigilant or a third party on Vigilant's behalf, including any end user profile-, visit-, session-, impression-, click through- or click stream- data and any statistical or other analysis, information or data based on or derived from any of the foregoing.

26. **"Vigilant Materials"** means all devices, documents, data, know-how, methods, processes, software and other inventions, works, technologies and materials, including any and all Services, Software, Documentation, computer hardware, programs, reports and specifications, client software and deliverables that are proprietary to Vigilant and provided or used by Vigilant in connection with performing the Services.



**PLATFORM**

CyberDNA®

**SERVICE**

The Vigilant Team

VigilantMDR

Attack Surface Reduction

Competitor Comparison

**SOLUTIONS**

Security

IT Ops

**CLIENTS**

Client Stories

Client Support

**COMPANY**

About Us

Careers

Partners

Blogs

Contact Us

Global Headquarters
7570 Bales Street
Suite 250
Cincinnati, Ohio
45069

Copyright Vigilant 2022    Terms and Conditions    Partner Conditions                    Twitter        LinkedIn

# Exhibit D

**Vigilant LLC**
7570 Bales St Ste 250
Liberty Township, OH  45069
+15134049639
ltraficanti@vigilantnow.com



# INVOICE

**BILL TO**
Helzberg Diamonds
1825 Swift Avenue
North Kansas City, MO  64116

**INVOICE #** 20788
**DATE** 01/30/2024
**DUE DATE** 02/14/2024
**TERMS** Net 15

| DATE | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| | Recapture Discount Given | 11 | 3,973.27 | 43,705.97 |
| | Remaining MRR on Agreement at Full Price | 25 | 18,571.77 | 464,294.25 |
| | Credit for  V365 discounts not provided | | | -10,323.23 |
| | V365 Overage not billed Sept to Jan 2024 | 2,735 | 2.50 | 6,837.50 |

If you need assistance, please contact Vigilant Accounting at 513-404-9639 or 513-309-0672.
Thank you for your business!

| | |
|---|---|
| SUBTOTAL | 504,514.49 |
| TAX | 0.00 |
| TOTAL | 504,514.49 |
| **BALANCE DUE** | **$504,514.49** |



MARY L. SWAIN
BUTLER COUNTY CLERK OF COURTS
**IF UNDELIVERABLE
RETURN TO:**
Butler Co. Clerk of Courts
ATTN: Issuance
315 High Street, 5th Floor
Hamilton, Ohio 45011



USPS CERTIFIED MAIL

9214 8901 9403 8300 0004 8224 61

**HELZBERGS DIAMOND SHOPS LLC
CSC LAWYERS INCORPORATING COMPANY
REGISTERED AGENT
221 BOLIVAR STREET
JEFFERSON CITY, MO 65101**

-------------------------------------------------------------------------------------------

March 13, 2025

-------------------------------------------------------------------------------------------

CV 2025 03 0580

Z000086271                                                      By: Norma Martin

FIRST-CLASS MAIL
IMI

$012.38

03/13/2025 ZIP 45011
043M32205804

CERTIFIED MAIL