FILED
MARY L. SWAIN
BUTLER COUNTY
CLERK OF COURTS
03/10/2025 04:41 PM
CV 2025 03 0580

## COURT OF COMMON PLEAS
## BUTLER COUNTY, OHIO

| | | |
|---|---|---|
| **VIGILANT LLC** <br> 7570 Bales Street, Suite 250 <br> West Chester, Ohio 45069 <br><br> Plaintiff, <br><br> v. <br><br> **HELZBERG'S DIAMOND SHOPS, LLC** <br> 1825 Swift Avenue <br> North Kansas City, Missouri 64116 <br><br> **SERVE ALSO: CSC LAWYERS** <br>     **INCORPORATING COMPANY** <br>     (Registered Agent) <br>     221 Bolivar Street <br>     Jefferson City, Missouri 65101 <br><br> Defendant. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | CASE NO. <br><br> Judge <br><br><br><br> **COMPLAINT** |

For its Complaint against Defendant Helzberg's Diamond Shops, LLC ("Defendant" or "Helzberg"), Plaintiff Vigilant LLC ("Plaintiff" or "Vigilant"), states as follows:

### PARTIES

1. Plaintiff Vigilant LLC is an Ohio limited liability company formed and existing under the laws of the State of Ohio. Vigilant provides high-quality managed detection and cyber security response services to customer subscribers both directly and through third-party providers.

2. Defendant Helzberg's Diamond Shops, LLC is a Missouri limited liability company formed and existing under the laws of the state of Missouri. Helzberg's principal office is located at 1825 Swift Avenue, North Kansas City, Missouri 64116.

1

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter because the agreements executed by the parties contain a consent to jurisdiction and provides that any action arising out of the agreement shall be brought exclusively in Butler County, Ohio. Additionally, the Court has jurisdiction because the services provided under the contract at issue was performed in Butler County Ohio. Plaintiff's damages and the harms and losses caused by Defendant for which Plaintiff seeks to recover exceed $25,000 and therefore are within the jurisdictional limits of this Court.

4. Venue is proper in Butler County, Ohio because the agreements executed by the parties provide that any action arising out of the agreement shall be brought in Butler County, Ohio. Additionally, Butler County, Ohio is the place where the claim for relief arose.

## FACTUAL ALLEGATIONS

5. On or about February 10, 2023, Helzberg and Vigilant executed the Vigilant Master Services Agreement ("MSA"). A true and correct copy of the MSA is attached as **Exhibit A**.

6. On or about February 15, 2023, Helzberg and Vigilant executed a Services Subscription Agreement. A true and correct copy of the Services Subscription Agreement ("Subscription Agreement") is attached as **Exhibit B**.

7. The Subscription Agreement expressly states that all terms and conditions applicable to the agreements between the parties are available online at https://vigilantnow.com/terms-conditions ("Terms & Conditions"). A true and correct copy of the Terms & Conditions is attached as **Exhibit C**. (The Master Services Agreement, the Subscription Agreement, and the Terms & Conditions are collectively referred to as "the Agreements.")

8. As part of the Subscription Agreement, "[Helzberg] agree[d] to pay all monthly fees that are invoiced properly and consistently with the below." Subscription Agreement p. 1.

9. Helzberg agreed that the "Contract Start Date will be established as the date that the Vigilant Subscription Letter was signed by Client and will continue for the Term identified below." *Id*. The Subscription Letter was signed on February 15, 2023. *Id*. p.4.

10. Both the Master Services Agreement and the Subscription Agreement confirm that term of the Agreements shall be three years. Master Services Agreement p. 8 at para. 5.1 ("initial term shall be deemed to be three (3) years from the Effective Date") and Subscription Agreement p.5 ("This Agreement shall commence on the Effective Date and remain in effect for three (3) years from the Effective Date.")

11. Vigilant agreed to provide certain monitoring and incident response services as described in the Agreements for the network systems and operating environments to which Helzberg gave Vigilant access.

12. In exchange, pursuant to the Subscription Agreement, Helzberg agreed to pay for initial setup and configuration costs in the amount of **$27,802.00** and full value of the monthly recurring costs of **$14,598.50** equal to the entire three year term. *See* Master Services Agreement; Subscription Agreement pp.1-4.

13. Helzberg further agreed that Helzberg "shall pay the fees set forth in the Agreement, which shall be determined and invoiced by Vigilant in accordance with the rates, pricing and discounts set forth in the Agreements." Master Services Agreement p. 9, para. 7.

14. Helzberg also agreed that the obligation to pay the Fees determined and invoiced by Vigilant would survive any expiration or termination of the Agreement. *Id*. p. 9, para. 6.

15. Based on the Agreements between the parties, Helzberg promised to pay Vigilant a total of **$553,348.00** for the products and services agreed to by Vigilant ("Subscription Amounts"). Subscription Agreement pp. 3-4.

16. Pursuant to the Agreements between the parties, Helzberg did not have a right to terminate the Agreements except where "Vigilant materially breaches the terms of the Agreement and fails to cure such breach within thirty (30) days of written notice." Master Services Agreement p. 8, para. 5.2. Thus, in the event that Helzberg believed that Vigilant breached the Master Services Agreement, if any dispute arose, Helzberg was required to provide Vigilant an opportunity to cure any claimed breach.

17. Helzberg did not provide written notice to Vigilant of any actual material breach of the Agreements as required under the Agreements and no such breach occurred, and in any event Helzberg did not provide any reasonable opportunity to Vigilant to cure any purported breach, material or otherwise, as Helzberg was required to do under the agreement. *See* Master Services Agreement pp.16-17, para. 14.3. Nor did Helzberg attempt to negotiate or resolve the disputes in good faith as it was required to do.

18. At all times, Vigilant responded timely to all inquiries and requests made by Helzberg to Vigilant. Prior to this lawsuit Vigilant offered on multiple occasions to meet with and discuss any concerns regarding the services provided by Vigilant. Indeed, Vigilant requested that if Helzberg believed that a breach had occurred, that Vigilant be given a reasonable opportunity to cure, which Helzberg did not do.

19. Notwithstanding the express terms of the Agreements and without authorization or consent from Vigilant, Helzberg unilaterally demanded and instructed Vigilant to exit Helzberg's networks and operating environment and cease providing all services under the Agreements effective on February 15, 2024. Although Helzberg instructed Vigilant to exit its networks and operating environments and cease providing services, Helzberg had no right or authority to

terminate the obligations under the Agreement and Helzberg remains obligated to pay the full amount due and owing under the terms of the Agreements as invoiced by Vigilant.

20. Helzberg did not have a good faith basis to demand that Vigilant cease providing services or to attempt to terminate the Agreements, and Helzberg failed to identify any good faith dispute with Vigilant concerning the obligations under the Agreements, including the amounts owed by reason thereof.

21. Vigilant issued an invoice dated January 30, 2024, in the amount of **$504,514.49**, reflecting the amounts owed under the Master Services Agreements, the Subscription Services Agreement, and the Terms & Conditions as adjusted. A true and correct copy of the Invoice is attached as **Exhibit D**. According to the invoice, payment in full was due on February 14, 2024. Given that the amounts due and owing under the Agreements was agreed to by the parties (*see e.g.*, Subscription Agreement p. 3), there is no reasonable basis to contest the amount owed by Helzberg to Vigilant.

22. Vigilant has demanded that Helzberg pay all amounts due and owing under the Agreements and as Invoiced.

23. Helzberg has wrongly failed and/or refused to pay the full amount of Fees that are owed as described in the Invoice and pursuant to the terms of the Agreements and Helzberg's obligation to pay in full is long past due.

24. Vigilant did not breach any agreement or commit any act or omission that would constitute a breach of the Agreements, material or otherwise, rather Vigilant acted in good faith at all times and fully performed all of its obligations under the Agreements.

25. Helzberg has materially breached the Agreements by failing and refusing to make the required payments for the full duration of the three-year term under the Agreements.

26. Vigilant attempted in good faith to resolve any disputes between the parties.

27. All conditions precedent to the filing of this action have been satisfied by Vigilant.

28. In addition to the Subscription Amounts owed by Helzberg to Vigilant, Helzberg agreed to pay Vigilant's fees including its professional and attorneys' fees incurred as a result of Vigilant having to assert a claim against Helzberg to recover the losses caused by Helzberg's breach or non-fulfillment of any representation, warranty, or covenant under the Agreement, any negligent act or omission on the part of Helzberg in connection with the performance of its obligations under this Agreement. *See e.g.*, Master Services Agreement p.12 at para. 10. Helzberg has failed to pay all amounts owed under the Agreements for the three-year contract term, and accordingly, Vigilant has had to file this lawsuit to obtain the amounts due and owing by Helzberg and to enforce its rights and Vigilant seeks all fees, including professional fees, attorneys' fees, and other costs expended in seeking to collect the amounts owed by Helzberg and enforcing its rights under the terms of the Agreements.

**COUNT I - BREACH OF CONTRACT/BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

29. Plaintiff incorporates the preceding paragraphs by reference as if fully rewritten herein.

30. Helzberg and Vigilant entered into the Master Services Agreement, the Subscription Services Agreement, and the Terms & Conditions whereby Helzberg agreed, among other things to pay for initial setup and configuration costs in the amount of **$27,802.00** and monthly recurring costs of **$14,598.50** for a minimum period of three years, including through and until at least February 9, 2026. Master Services Agreement p. 8, para. 5.1; Subscription Agreement pp. 1-4.

31. The Agreements required that if Vigilant were found to have materially breached the Agreements, Helzberg was required provide written notice and a thirty (30) day opportunity to cure.

32. The Master Services Agreement, the Subscription Services Agreements, and the Terms & Conditions are valid and enforceable contracts.

33. Vigilant has performed all of Vigilant's obligations required under the Master Services Agreement, the Subscription Services Agreements, and the Terms & Conditions.

34. Vigilant has demanded that Helzberg pay all amounts due and owing under the terms of the Master Services Agreement, the Subscription Services Agreements, and the Terms & Conditions and as Invoiced by Vigilant.

35. Helzberg has materially breached the Master Services Agreement, the Subscription Services Agreements, and the Terms & Conditions by wrongfully failing and/or refusing to timely pay the required amounts owed and as Invoiced by Vigilant.

36. Helzberg has materially breached the Agreements by failing and/or refusing to provide written notice of any actual material breach on the part of Vigilant, indeed, there was no breach material or non-material on the part of Vigilant, and Helzber failed to provide Vigilant with thirty (30) days notice and a reasonable opportunity to cure any such alleged breach or dispute.

37. Helzberg has breached the duty of good faith and fair dealing by refusing to cooperate with Vigilant and to provide Vigilant with a reasonable opportunity to respond to and/or resolve any concerns, issues, or disputes identified by Helzberg before Helzberg directed Vigilant to cease providing services under the Agreements.

38. Helzberg's failure and/or refusal to pay the amounts owed as determined and invoiced by Vigilant are material breaches of the Master Services Agreement, the Subscription Services Agreements, and the Terms & Conditions.

39. Helzberg's breaches of the Agreements, including its failure to provide required notices, failure and/or refusal to negotiate in good faith, failure to provide Vigilant with the required opportunity to cure in the event that a material breach were deemed to have occurred, and failure and/or refusal to pay the amounts owed and invoiced have directly and proximately caused Vigilant to suffer damages, harms, and losses in an amount to be determined at trial and in excess of $25,000.

40. Vigilant is entitled and further demands that Helzberg pay all amounts due and owing under the Invoice and for all fees, professional fees, attorneys' fees, and other costs expended in seeking to collect the amounts owed by Helzberg and enforcing Vigilant's rights under the terms of the Agreements.

### COUNT II - TORTIOUS INTERFERENCE WITH BUSINESS AND ECONOMIC RELATIONSHIPS

41. Plaintiff incorporates the preceding paragraphs by reference as if fully rewritten herein.

42. Helzberg knew about the existence of one or more of Vigilant's business relationships during this timeframe and economic expectations with its business relationships, referrals, and business interests.

43. Helzberg knew that Vigilant had reasonable expectations that such business relationships would continue and result in contracts for services to be provided by Vigilant in exchange for payment by those with whom Vigilant had a business relationship.

44. Helzberg, through its Security Operations Lead, Michael Ford and others, during industry meetings and conferences including, at a conference in March 2024, tortiously interfered with one or more of Vigilant's known business relationships when Helzberg and Ford made improper statements for improper purposes to other professionals and individuals in the industry, including having made false, misleading, and disparaging statements about Vigilant and its provision of services, the quality and competence of the services provided by Vigilant, including but not limited to:

    a. Vigilant failed to provide the services agreed to between Vigilant and Helzberg;

    b. Vigilant failed to detect certain threat actors within Helzberg's systems; and

    c. That Helzberg does not know why the business would use Vigilant as a data security provider and stating or implying that businesses should not use Vigilant as a data security provider and implied that Vigilant would provide inadequate services and miss detections if contracted to do so.

45. Helzberg's statements were false, misleading and made by Helzberg for improper purposes, for reasons including that:

    a. Helzberg did not accurately describe the terms or obligations under the Agreements between Vigilant and Helzberg;

    b. Vigilant did not fail to provide any services agreed to between Vigilant and Helzberg;

    c. Vigilant did not fail to detect threat actors in network systems or operating environments where Vigilant had been granted access by Helzberg to monitor and detect threat actors; and

      d. Vigilant did not have an agreement or obligation to detect any threat actors in network systems or operating environments to which Helzberg did not provide access to Vigilant or that were not outlined in the Agreements.

46. Helzberg's statements were made improperly and intentionally for the purpose of interfering with Vigilant's business relationships, to terminate the Vigilant's business relationships, and/or to prevent Vigilant from entering into a contract with one or more of Vigilant's business relationships known to Helzberg and Helzberg's false, misleading, and improper statements were made to individuals, and company representatives, referral sources, and/or customers who worked with, were intending to do business with, considered doing business with, and/or otherwise referred business to Vigilant.

47. Helzberg, through the statements made by Ford and others, did not have any justification or privilege to make false or misleading statements or disparaging statements about Vigilant and the service and capabilities Vigilant provides, created negative implications about Vigilant and/or the quality or competence of the data security services Vigilant provides.

48. Helzberg's statements and acts of intentional interference directly and proximately caused one or more of Vigilant's business relationships to terminate its relationship with Vigilant and interfered with and/or prevented Vigilant from entering into a contract for payment of Vigilant's services with one or more of Vigilant's business relationships and/or referral sources.

49. Helzberg's false statements and other tortious acts of interference made through Ford directly and proximately caused Vigilant to suffer damages, harms, and losses in excess of $25,000 in an amount to be proven at trial.

50. In addition Vigilant is further entitled to recover punitive and exemplary damages caused by Helzberg's wrongful conduct as described herein.

51. Vigilant is entitled and further demands that Helzberg pay all damage and for all fees, professional fees, attorneys' fees, and other costs expended in seeking to collect the amounts owed by Helzberg and enforcing Vigilant's rights under the terms of the Agreements.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Vigilant LLC demands judgment against Defendant Helzberg as follows:

1. Actual damages in excess of $25,000, the amount which will be proven at trial;

2. All pre-judgment and post-judgment interest on all damages at the highest rate allowable by law;

3. Punitive and exemplary damages caused by Helzberg's wrongful conduct;

4. For all fees, professional fees, attorneys' fees and costs incurred in this lawsuit and as permitted under the Agreements;

5. For any and all other legal or equitable relief to which Vigilant may be justly entitled.

Respectfully submitted,

/s/ Sanna-Rae Taylor
Sanna-Rae Taylor (0091302)
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
Phone: (513) 381-2838
Fax: (513) 381-0205
srtaylor@taftlaw.com

*Trial Counsel for Plaintiff Vigilant LLC*

## **INSTRUCTIONS TO THE CLERK**

Please serve a copy of the Complaint and Summons via certified mail, return receipt requested, upon each address listed for the Defendant listed in the caption, according to the Ohio Rules of Civil Procedure and applicable law.

/s/ Sanna-Rae Taylor
Sanna-Rae Taylor